**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**S. Lawrence KAHN, Arthur B. Sachs and**
**M. Prial Curran, Defendants-**
**Appellants.**

**Nos. 15665–15667.**

United States Court of Appeals
Seventh Circuit.

June 29, 1967.

Rehearing Denied Sept. 12, 1967,
en banc.

Richard E. Gorman, Anna R. Lavin, William T. Kirby, Don H. Reuben, Lawrence Gunnels, John E. Angle, of Kirkland, Ellis, Hodson, Chaffetz & Masters, Thomas W. Bloss, of Hubachek, Kelly, Miller, Rauch & Kirby, Chicago, Ill., for appellants, Arthur B. Sachs and M. Prial Curran.

Edward V. Hanrahan, U. S. Atty., Michael B. Nash, Asst. U. S. Atty., Chicago, Ill., for appellee, John Peter Lulinski, Richard G. Schultz, Lawrence Jay Weiner, Asst. U. S. Attys., of counsel.

Before HASTINGS, Chief Judge, and SWYGERT and FAIRCHILD, Circuit Judges.

HASTINGS, Chief Judge.

We consider separate appeals by S. Lawrence Kahn, Arthur B. Sachs and M. Prial Curran from their convictions, following a jury trial in the district court, upon jury verdicts of guilty.

Kahn, and Sachs and Curran, attorneys for Kahn, were indicted with others as conspirators in a scheme to illegally use moneys of a number of federally insured banks and savings associations for their personal benefit. In addition to the conspiracy count, the defendants were charged in a number of other counts as principals or as aider-abettors in illegally misapplying funds deposited in federally insured institutions.[1]

Kahn and Sachs were each sentenced to serve five years on a number of separate counts of the indictment, the sentences to run concurrently. Curran was sentenced to two years on each of a number of counts, the sentences to run concurrently.

The sufficiency of the evidence is not challenged. Since we are not required to review the evidence for its sufficiency, only the essential nature of the Government's case need be shown.

The evidence put on by the Government, which the jury could have believed, tended to show that this was a case of untrustworthy men in trust; of loans without security, mortgages without property, checks without funds; of grossly unrealistic appraisals of real estate; of emptied banks acquired for their tills; of furtive manipulation and deceit. All this, in an accelerating necessity of acquisition, by taking from one bank as Peter to pay another as Paul, a pace in front of examiners, and a suspicion ahead of interested parties, to the ultimate benefit of defendants.

On appeal, defendants contend that the trial court committed error in many respects. Sachs and Curran urge that the indictment is fatally defective in its substantive counts as well as in its conspiracy count. They claim that the trial court gave a prejudicial credibility instruction and that they were prejudiced by the trial court's failure to give a "La Buy" instruction concerning lying witnesses. They further contend that the trial court should have granted a mistrial when a co-defendant, Thomas Joyce, pleaded guilty in the early stages of the trial as an aider and abettor. Finally, they assert that prejudicial error was committed by the trial court's refusal to grant them a severance from Kahn.

---

1. The full indictment contained eighteen counts. A number of these were dismissed. In addition, the Government on appeal suggests that we not consider the sufficiency of the participation counts, and we have not done so. The remaining counts of the indictment, on which defendants were convicted and which we have considered, are set out in the appendix.

Kahn was indicted in seventeen counts, eleven of which were dismissed. He was found guilty on the remaining counts, counts I, III, IV, VII, XVI and XVII.

Sachs was charged in seventeen counts, seven of which were dismissed. He was found guilty on the remaining counts, counts I, III, IV, VII, VIII, IX, X, XI, XVI and XVII.

Curran was indicted in eight counts, four of which were dismissed. He was found guilty on the remaining counts, counts I, III, XVI and XVII.

In Kahn's appeal, in addition to the above contentions respecting the defectiveness of the indictment, the joinder of defendants and the mistrial upon Joyce's plea of guilty, which he also urges, Kahn claims that there was an improper joinder of counts, that the trial court erred in not giving a certain instruction as his theory of defense, and that irrelevant and immaterial evidence was wrongly admitted at trial.

### Sufficiency of the Indictment

■ At the outset of our consideration, we note that we do not suffer the inability of the antique common law "to understand or accept a pleading that did not exclude every misinterpretation capable of occurring to intelligence fired with a desire to pervert." Paraiso v. United States, 207 U.S. 368, 372, 28 S. Ct. 127, 129, 52 L.Ed. 249 (1907). Indictments are read for their clear meaning, and convictions are not reversed because of minor deficiencies which did not prejudice the accused. Smith v. United States, 360 U.S. 1, 9, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959).

■ It is not necessary in a conspiracy indictment to allege with precision all the elements essential to the offense which is the object of a conspiracy; allegations clearly identifying the offense defendants conspired to commit are sufficient. Wong Tai v. United States, 273 U.S. 77, 81, 47 S.Ct. 300, 71 L.Ed. 545 (1927).

■ The test for the sufficiency of an indictment is "whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a formal acquittal or conviction.'" Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932); United States v. Airdo, 7 Cir., 380 F.2d 103 (June 19, 1967).

■ The last two conditions of the test are not equivalent to the first, for the first establishes what must be proved, that combination of elements without which there is no crime alleged. Whether the elements are sufficiently alleged does not depend upon nice attention to technicality or formulistic recitals. "Upon a proceeding after verdict at least, no prejudice being shown, it is enough that the necessary facts appear in any form, or by their fair construction can be found within the terms of the indictment." Hagner v. United States, supra 285 U.S. at 433, 52 S.Ct. at 420. Cf. Rule 52(a), Federal Rules of Criminal Procedure, 18 U.S.C.A.

■ While *Hagner* may be distinguished by the fact that it was concerned with a post verdict attack upon an indictment, its reasoning is applicable to indictments attacked before verdict, as long as no prejudice to defendants is shown in the indictment.

It is, however, in an asserted incomplete allegation of elements that defendants attack the sufficiency of the indictment.

The defendants contend that the first count of the indictment, the conspiracy count, is fatally defective because it contains no allegation that any of the alleged conspirators was connected in any capacity with any of the institutions named in the count.

Count I, brought under § 371, 18 U.S.C.A., alleges a conspiracy to violate §§ 656, 657, 1001, 1005, and 1006, 18 U.S.C.A. Of these statutes, only § 371, which prohibits conspiracy to commit an offense or to defraud the United States, and § 1001, which relates to false and fraudulent statements, do not require that the alleged offender be "an officer, agent or employee of or connected in any capacity" with federally authorized or protected financial institutions. The substantive count of the indictment relating to § 1001, count XVIII, was dismissed. Defendants assert, therefore, that the § 1001 reference in count I cannot cure the failure of the count to allege the requisite capacity called for in the remaining four substantive statutes.

Count I, however, does allege that defendants controlled the management and operation of certain named financial institutions. In addition, it alleges certain overt acts in furtherance of the conspiracy; and some of the charged overt acts note certain official connections with the financial institutions named in the indictment.

These read as follows:

"3. On or about November 1, 1962 at Chicago, Illinois, S. Lawrence Kahn *presided* at a meeting of the Executive Committee of the Chatham Bank of Chicago.

\*　\*　\*　\*　\*　\*

"10. On or about December 20, 1962 M. Prial Curran executed an escrow agreement as *escrow agent* for Chatham Bank of Chicago relating to the sale of permanent reserve shares of Equitable Savings and Loan Association.

\*　\*　\*　\*　\*　\*

"14. On or about February 19, 1963 at Chicago, Illinois Rudy Weinberg was elected Secretary-Treasurer and Arthur B. Sachs appointed *General Counsel* of Equitable Savings and Loan Association by the Board of Directors of Equitable Savings and Loan Association." [Emphasis added.]

Defendants, however, citing Pettibone v. United States, 148 U.S. 197, 13 S.Ct.

542, 37 L.Ed. 419 (1893); Brenner v. United States, 2 Cir., 287 Fed. 636 (1922); United States v. Devine's Milk Laboratories, Inc., D.Mass., 179 F.Supp. 799 (1960), assert that allegations of overt acts cannot cure an inadequacy in a conspiracy indictment.

In *Pettibone*, supra 148 U.S. at 203, 13 S.Ct. at 545, the Supreme Court said: " \* \* \* the conspiracy must be sufficiently charged, and cannot be aided by averments of acts done by one or more of the conspirators in furtherance of the object of the conspiracy."

The strictness of *Pettibone* was eroded, however, in Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912) where the Court interpreted § 5440 of the Revised Statutes, the present § 371 conspiracy statute, which in its critical language reads exactly as § 5440 did.[2] It was stated that while at common law it was not necessary to aver or prove an overt act, § 5440 did require, as does § 371, some act to effect the conspiracy. Consequently, an overt act was required to be alleged along with conspiracy to constitute the offense under the federal statute.

 Since an overt act is part of the offense, we see no reason why it may not be used to clarify the remainder of the count. This reading of the count as a whole is in accord with modern practice in reading indictments.[3] Cf. *Smith,* supra; *Hagner,* supra; Rule 52(a), supra.

---

2. The pertinent language of § 5440 reads:
 "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States \* \* \* and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable \* \* \*."
 Section 371 reads in pertinent part:
 "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States \* \* \* and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined \* \* \*."

3. *Hyde* was concerned with a construction of a conspiracy count for purposes of venue, and it may be supposed that it does not concern itself with the essential elements of the crime of conspiracy, but only with where a conspiracy may be deemed to have taken place, for purposes of venue. This belies the language of *Hyde*, which directly states that an overt act is a requisite element of conspiracy.
 It is an anomaly that an indictment charging a conspiracy must charge an agreement to commit an offense, the object of the conspiracy, and an overt act, United States v. Offutt, 75 U.S.App.D.C. 344, 127 F.2d 336 (1942), but that allegations under the title of overt acts sup-

Reading count I of the indictment as a whole, we hold that its allegations of control of management and operation, together with the factual allegations of overt acts, naming or at least intimating each of the defendants to have an official position with some of the financial institutions involved, satisfy the requirement that at least one of the conspirators be "connected in any capacity" with the institutions named in the count.

■ The defendants also challenge the sufficiency of the substantive counts of the indictment. Citing United States v. Quinn, 7 Cir., 365 F.2d 256 (1966); United States v. Britton, 107 U.S. 655, 2 S.Ct. 512, 27 L.Ed. 520 (1882); and United States v. Northway, 120 U.S. 327, 7 S.Ct. 580, 30 L.Ed. 664 (1887), they urge that the misapplication counts of the indictment fail to allege the essential elements of conversion. Since the indictment was tested by motions for bills of particulars, which were denied, the alleged defect in the indictment has not been cured by failure to act on defendants' part.

In *Britton*, supra at 666–667 of 107 U.S., 2 S.Ct. at 522, the Supreme Court stated:

"We think the willful misapplication made an offence by this statute means a misapplication for the use, benefit, or gain of the party charged, or of some company or person other than the association. Therefore, to constitute the offence of willful misapplication, there must be a conversion to his own use or the use of some one else of the moneys and funds of the association by the party charged. This essential element of the offence is not averred in the counts under consideration * * *."

In *Quinn*, supra at 260 of 365 F.2d, this court, merely repeating the language of the Supreme Court in *Britton* at 669 of 107 U.S., 2 S.Ct. 512, interpreted *Britton* to hold only that the averment "wilfully misapplied" was not sufficient in an indictment, but that there must be further averments that the willful misapplication was made and that it was unlawful. In *Quinn*, the requirement of a further averment beyond that of willful misapplication was satisfied by the averment that the defendant converted the moneys in question to his own personal use.

■ Contrary to defendants' contention, *Quinn* does not require the incantation of an allegation of conversion in an indictment under § 657 or § 1006, 18 U.S. C.A. in order for the indictment to withstand a test of its sufficiency. As stated, the only requirement recognized by

posedly may not be resorted to in order to clarify the language charging conspiracy, United States v. Knox Coal Company, 3 Cir., 347 F.2d 33 (1965), cert. den., 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965); Reno v. United States, 5 Cir., 317 F.2d 499 (1963), cert. den., 375 U.S. 828, 84 S.Ct. 72, 11 L.Ed.2d 60 (1963). We have searched for the reason for this anomaly, but have found none other than dead forms ruling from the grave.

The *Knox* and *Reno* cases, which simply state a rule concerning allegations of overt acts, rely upon Joplin Mercantile Co. v. United States, 236 U.S. 531, 35 S. Ct. 291, 59 L.Ed. 705 (1915). The concern of *Joplin* is the agreement to conspire, and the Court there stated that overt acts cannot be used to show that the agreement was against federal law because "the averment of the making of the unlawful agreement relates to the acts of all the accused, while overt acts may be done by one or more less than the entire number * * *." *Joplin* at 535–536, 35 S.Ct. at 293. In other words, an overt act alleging that one did an illegal thing does not allege that all conspired to do so, and therefore it cannot be relied upon as a charge.

The instant indictment is rather different, for the conspiracy count adequately charges conspiracy, and it is not necessary to refer to overt acts to find an illegal agreement.

Under the statutes under which defendants are charged, only one individual need have a connection with a federally insured institution. Allegations to that effect in the overt acts supply that identification without the danger, recognized in *Joplin*, that all defendants will be deemed to have conspired to do what was alleged in an overt act because one did so.

*Quinn* is an averment showing an unlawful application which, if proved, would amount to a conversion. Such an averment is necessary in order to avoid charging and convicting an individual for no more than maladministration, mistake, or ineptitude. Cf. *Britton*, supra at 667–668 of 107 U.S., 2 S.Ct. at 512. Where it is clear that the allegedly defective count of the indictment cannot be read to charge mere maladministration, then the count is sufficient. Cf. *Britton*, id.

As applied to the instant case, therefore, the sufficiency of the counts of the indictment is to be tested, not by whether they literally allege conversion, but whether they allege unlawful application with the intent to defraud the association, to the use of some party other than the association.

Having carefully examined the counts of the indictment, we find that a number of them sufficiently charge an unlawful application to withstand the attack upon the sufficiency of the indictment. Cf. *Ramirez v. United States*, 9 Cir., 318 F. 2d 155 (1963).

■ Count III of the indictment charges Kahn, as vice-president and member of the Board of Directors of Chatham Bank of Chicago, and Sachs, as attorney of the Chatham Bank, with having fraudulently caused the disbursal of Chatham's check in the amount of $225,000, payable to Midwest Bank and Trust Company, which sum was represented to be the proceeds of a loan made to Sandy Building Corporation, secured by a mortgage on certain identified property, "well knowing that said property failed to provide sufficient security for the loan in that said property had fair market value substantially less than the disbursement * * *." The unlawful application of bank funds charged in this count is the knowing and purposive disbursal, without adequate security, of bank funds to a third party. The additional allegation in the count that such disbursal was made with the intent to defraud indicates that the disbursal, made knowing the inadequacy of the security, was not an act of maladministration, but one of criminal misapplication.

Count IV of the indictment similarly charges Kahn and Sachs with fraudulently causing the disbursal of a Chatham check in the amount of $155,000, payable to Edward Ferrari, purportedly representing proceeds of a Chatham loan in that amount which Kahn and Sachs fraudulently caused to be granted to Ferrari, "well knowing that the proceeds of said loan would be used for the personal benefit and advantage of said defendants and further well knowing that said loan was granted on the basis of a false and fraudulent letter of commitment" from a certain savings and loan association, and knowing the letter of commitment was executed without authority.

■ Defendants attack the sufficiency of this count, notwithstanding its charge of conversion, on the ground that it only speculates concerning a use in the future. This ground of attack is mistaken. Willful misapplication is the crime charged. As we have said, a conversion need not be alleged as long as an unlawful application is shown by allegations. This was adequately done. Furthermore, the allegation of illegal disbursal to Ferrari, a third party, with knowledge that the proceeds of the loan would be used for their personal benefit in effect alleges a present conversion to a third party or to an agent of Kahn and Sachs.

The charges of count VII are adequate for the same reasons. Counts VIII and X, which were dismissed as to Kahn, also sufficiently charge a crime by Sachs.

■ Count XVI of the indictment charges Sachs and Curran with the misapplication of moneys belonging to and entrusted to the care and custody of Equitable Savings and Loan Association, of which Curran was a director and Sachs, attorney, in a fashion similar to the other counts. The count charges the illegal transfer of $625,070.27 to a certain named institution, which amount allegedly represented partial proceeds from a loan Sachs and Curran fraudu-

lently caused to be made by Equitable, based upon inadequate security and a false appraisal report. Once again, the allegation of unlawful application is satisfied by showing a transfer to a third party, without adequate security and through means of false information, of funds of a federally insured savings and loan association.

From the foregoing considerations, we conclude that those counts of the indictment about which there is a contest on appeal adequately charge crimes, and we hold that the indictment was sufficient.

### Credibility Instruction

During the trial, the trial judge made an *in camera* inspection of FBI reports, which were based on FBI interviews with Sachs and Curran and which were not admitted into evidence at trial. Sachs and Curran contend that the trial judge's reading of the inadmissible material[4] and his resultant belief that there was a discrepancy between the defendants' testimony at trial and the information given in the FBI reports caused him to give a prejudicial credibility instruction.

At the conference on instructions, the Government tendered a "La Buy" credibility instruction, which defendants accepted without objection. This instruction reads:

"In weighing the testimony of each witness the jury should consider his relationship to the Government, or to the defendant; the witness's interest, if any, in the outcome of the case; his manner of testifying; his candor, fairness and intelligence; and the extent to which he has been corroborated or contradicted, if at all, by other credible evidence.

"A defendant who wishes to testify is a competent witness, and his testimony should not be disbelieved merely because he is the defendant. However, in weighing his testimony, the jury should consider the fact that a defendant has a vital interest in the outcome of this trial."

The trial judge in his charge to the jury, however, without notice to the Government or defendants, gave a much longer instruction relating to credibility.[5]

---

4. The FBI reports were made inadmissible by stipulation. The trial court was forced to consider the reports carefully upon repeated Government motions that it be allowed to use them for impeachment purposes. All the Government's motions were denied.

5. The instructions relating to credibility given by the trial court in large part closely parallel those given by Judge Medina in United States v. Foster, D.C., 9 F.R.D. 367, 388–389. While appeals were taken and the case was ultimately affirmed, United States v. Dennis, 2 Cir., 183 F.2d 201 (1950), 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1950), the instructions themselves were not passed upon.

The instructions relating to credibility given by the trial court read as follows:

"Now I come down to the general question, which is a problem in any criminal case of this type, and that deals with the question of the credibility of the witnesses who have testified because in the final analysis in this case, when you arrive at your verdict, it will be on the basis of the testimony that you heard here on the part of witnesses who took the witness stand, plus the documentary evidence that has been introduced.

"Now, I don't think that I have to remind you that this particular case bristles with issues of veracity. I think that in instances too numerous to specify the testimony of the witnesses called by the Government has been flatly contradicted by the testimony of the defendants.

"I call your attention only to one part of the testimony and I call your attention to that because it has been referred to in the closing arguments of counsel, and it is also more recent than some of the other testimony that you may have heard, the testimony that you heard here.

"You will recall that there was some testimony furnished by the two defendants to the effect that before the $800,-000 loan was disbursed, a loan committee meeting had been called in the office of Mr. Sachs and in which the two defendants testified that certain parties were present and they discussed the making of an $800,000 loan.

"Other witnesses in this case took the witness stand—and I am referring to Mr. Regas, the witness Regas; the wit-

Defendants urge that this longer instruction was given because the trial judge's reading of the FBI reports caused him to perceive discrepancies in testimony, to be suspicious of defendants' testimony, and therefore to over-

ness Wolfson, and, I believe, Mr. Lampros, but you will recall what the evidence was, in which they denied that any such meeting took place for the purpose of discussing the $800,000 loan in a loan committee meeting.

"Now, you as the jury—I am making no comment on this evidence, I am simply calling this evidence to your attention for the purpose of demonstrating what I mean when I am discussing the question of the credibility of witnesses.

"You will have to decide and you will have to make the choice as to which witnesses were speaking the truth. It is your function and your function alone to decide where the truth lies in this case.

"Now you may be asking yourself by what yardstick and in accordance with what rules of law you as the jury are to judge the credibility of the witnesses, including that of the two defendants who offered themselves as witnesses.

"Now, I suppose that every witness who takes the witness stand here and raises his hand is presumed to speak the truth. But this presumption may be outweighed by the manner in which the witnesses testify, by the character of the testimony that he gives or by contradictory evidence.

"You should carefully scrutinize the testimony given, the circumstances under which each witness has testified in this case and every matter in evidence which tends to indicate whether the witness is worthy of belief.

"Now, you should consider each witness's intelligence, his motive, if you think there was some motive; his state of mind, his demeanor and manner while on the stand.

"You should also consider any relation each witness may bear to either side of the case. You should consider the manner in which the witness may be affected by the verdict and the extent to which, if at all, each witness is either supported or contradicted by other evidence.

"Now, inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause the jury to discredit such testimony.

"Two or more persons witnessing an incident or a transaction may see it or hear it differently and innocent misrecollection, like failure of recollection, particularly as to times, dates, and places, is not an uncommon experience.

"In weighing the effect of a discrepancy I want you to consider whether it pertains to a matter of importance or to an unimportant detail and whether the discrepancy results from innocent error or wilful falsehood.

"Now, if you find that the presumption of truthfulness is to be outweighed as to any witness, then you will give the testimony of that witness such credibility, if any, as you think that it deserves.

"Now, in other words, there is nothing different in the way that a jury is to determine the credibility of a witness from that in which all reasonable persons size up other people with whom they are dealing when they make important decisions.

"Now, as to that, you consider whether the person with whom you are dealing had the capacity and the opportunity to observe and be familiar and remember the things that he tells about. You consider any possible interest that he may have, any bias or prejudice. You decide whether the witness strikes you as being fair and candid; in other words, you size him up and then you consider the inherent believability of what he says and whether it accords with your own knowledge or experience. The same thing is true with witnesses; you ask yourself if they know what they are talking about. You watch them on the stand. You decide how their testimony strikes you.

"Take the matter of interest, for example. You may feel that some of the witnesses, whether for the Government or for the defense, have an interest in the outcome of this case. Where a witness has a strong personal interest in the outcome of a trial, the temptation may be strong to color, pervert or withhold the facts, or even though completely honest, a witness who has an interest in the case may unconsciously shade his testimony.

"On the other hand, such a witness may be telling the exact truth despite his interest in the outcome. You must consider all of the attendant circumstances in determining whether and to what extent interest has affected a witness.

"What I have said concerning the interest of the witness applies with equal force to the matter of bias and preju-

stress prejudicially the jury's duty to consider a witness's bias and interest in the outcome of the trial. It is contended, in effect, that by his insistent emphasis on credibility, the trial judge conveyed to the jury what almost amounted to a direction that the testimony of Sachs and Curran required more than ordinary scrutiny and that it could be rejected entirely.

■ Length alone is not a controlling factor in assessing prejudice. Cf. United States v. Birnbaum, 2 Cir., 373 F.2d 250, 257 (1967). Nonetheless, there are two questions which must be answered with respect to the credibility instruction given. The first determination to be made is whether it can be fairly said that the instruction singles out or unmistakably refers or draws attention to Sachs and Curran, or whether it was applicable to all witnesses who testified. It must then be determined whether the extended emphasis on credibility prejudiced them.

After examination of the challenged instruction, we cannot say that the jury was alerted that the credibility of Sachs and Curran, as distinguished from that of other witnesses, was to be given special examination. The instruction is directed to the credibility of all witnesses, is qualified to insure that it has application to all witnesses, and properly notes what can be taken into account in assessing credibility.

■ Other than what is claimed to be unwarranted emphasis, defendants do not argue that the instruction incor-

rectly states the law relating to credibility. It may indeed be that the FBI reports prompted the trial judge to give this instruction. However, to suggest that the origin of or motive for the unusually long instruction taints its substance is to assume that it is nothing more than its sources. Nothwithstanding the possible origination of the instruction, we look to and judge only its legal substance.

While long, we find that the instruction was carefully balanced and that while it dealt at length with credibility, it in no way indicated who or what was credible or incredible. What appears to emphasize when taken out of context is, in fact, unstressed in context. Reading the instruction on credibility with the other instructions, and taking the charge to the jury as a whole, we hold that there was no prejudicial emphasis upon defendants' credibility.

### Instruction on Lying Witnesses

Sachs and Curran also contend that the trial court gave an erroneous instruction concerning lying witnesses. A standard instruction in this area is the "La Buy" *falsus in uno, falsus in omnibus* instruction which reads:

"If the jury believes that a witness has wilfully sworn falsely to a material fact in the case, the jury may disregard his testimony in whole or in part, except insofar as it may have been corroborated by other credible evidence." La Buy Manual on Jury In-

---

dice; where you find that any witness has any bias or prejudice for or against any of the parties, you will consider whether and to what extent such bias or prejudice may have affected his testimony.

"You will, accordingly, observe that before reaching any conclusions as to whether or not you will believe the testimony of any particular witness or as to whether you will believe part of the testimony of a particular witness and reject the rest, it is essential that you give consideration to all of the circumstances bearing on the question of the credibility of a witness, as I have just indicated.

"If you believe that any witness in this case testified falsely as to a material fact, then you may disregard that testimony, except insofar as it may be corroborated by other credible evidence in the case; in other words, what I want you to do is to take all of the evidence in the case, all of the testimony given from the witness stand, all of the exhibits that have been introduced and then go back to the jury room and say by your verdict whether these defendants are guilty of the charges made in this indictment or are innocent of the charges made in this indictment."

structions in Federal Criminal Cases, 33 F.R.D. 523, 574.

Relying on the fact that the Government had tendered this instruction, and believing that it would be given, counsel for Sachs and Curran, in closing argument, asked the jury to disbelieve totally the testimony of one witness, if they found that the witness testified falsely.

The trial court, however, gave an instruction, the second paragraph quoted below, to which the defendants object:

"You will, accordingly, observe that before reaching any conclusions as to *whether or not you will believe the testimony of any particular witness or as to whether you will believe part of the testimony of a particular witness and reject the rest,* it is essential that you give consideration to all of the circumstances bearing on the question of the credibility of a witness, as I have just indicated.

"If you believe that any witness in this case testified falsely as to a material fact, then you may disregard that testimony, except insofar as it may be corroborated by other credible evidence in the case; in other words, what I want you to do is to take all of the evidence in the case, all of the testimony given from the witness stand, all of the exhibits that have been introduced and then go back to the jury room and say by your verdict whether these defendants are guilty of the charges made in this indictment or are innocent of the charges made in this indictment." [Emphasis added.]

The words of the "La Buy" instruction defendants find critical in comparison with the given instruction are "the jury may disregard his testimony in whole or in part * * *." In comparing this language with the contested instruction, defendants claim that the latter directs the jury to disbelieve only the specific testimony deemed false, and that it does not tell the jury it could disregard the whole of that witness's testimony as well.

That defendants' construction is strained is revealed by their argument that the given instruction tells the jury it may believe what it thinks false if the false testimony is corroborated. It is more natural, and therefore preferable, to read the given instruction to say that the testimony of a witness disbelieved with respect to a material fact may be disregarded in whole, except as corroborated.

With due respect to the ideal statement of the "La Buy" instruction, the instruction given, together with the paragraph preceding it, in the language we have shown emphasized, conveys the same meaning: *falsus in uno, falsus in omnibus.* We hold there was no error in the giving of this instruction.

### Failure to Declare a Mistrial

Thomas Joyce was indicted and stood for trial along with Kahn, Sachs and Curran. On the second day of the trial, before witnesses were put on, he pleaded guilty, out of the presence of the jury, to aiding and abetting Sachs and Kahn in misapplying funds of the Chatham Bank, the fourth count in the indictment in which they were named as principals. Following Joyce's plea, the defendants moved for a mistrial on the ground that Joyce's plea could not be explained to the jury without prejudicing the defendants. The further argument was made that one cannot be guilty of aiding and abetting unless a principal is found guilty of the same crime. Finally, it was argued that, with respect to the remaining counts of the indictment, some of which also included aiding and abetting charges against some of the defendants, it would be necessary for the court to tell the jury in its charge that the guilt of an aider-abettor is dependent upon that of the principal.

The trial judge denied the motions, and when the jury was returned, he instructed it that Joyce had pleaded guilty to count IV of the indictment, that Kahn and Sachs remained as defendants in count IV and that the trial would proceed against them. He then went on to in-

struct the jury at that time that Joyce's plea was not evidence of the guilt of the other defendants charged in the count and that the guilt or innocence of the other defendants was to be determined solely on the evidence introduced in the trial. The court gave a similar instruction in its charge to the jury at the conclusion of the trial.

On appeal, the same grounds are urged in favor of the proposition that a new trial should be granted. Additionally, it is asserted that the trial court abused its discretion in failing to declare a mistrial at such an early stage.

We cannot clearly know how certain disclosures or incidents at trial may affect the collective mind of the jury. The argument that a specific occurrence was prejudicial is always an argument that under the facts of the particular case the jury was probably so impressed with the occurrence that it could no longer perform its functions clear-mindedly and fairly. The rationale of cautionary or curative instructions, on the other hand, is that the impression of the occurrence has not been so great that the jury cannot, as it were, bracket the occurrence, and disregard it.

The defendants have equated Joyce's guilty plea with a confession or statement admitted against a co-defendant, such as is found in Barton v. United States, 5 Cir., 263 F.2d 894 (1959); Schaffer v. United States, 5 Cir., 221 F.2d 17 (1955); and United States v. Haupt, 7 Cir., 136 F.2d 661 (1943). Extensive descriptive statements were involved in the foregoing cases, and it was determined that statements of a defendant which were admitted into evidence and which were incriminating as to other defendants were so prejudicial as to have required separate trials.

██ While a plea of guilty is a confession of guilt, it lacks the impress, before substantial evidence has accumulated at trial, of a confession or statement in which the hard features of connected facts form a silhouette of verity. Notwithstanding the countervailing efficiency of granting a motion for a mistrial at an early stage of trial, a guilty plea entered then is not the equivalant of a descriptive confession of criminal deeds.

While we have distinguished between an extended confession of guilt and a plea of guilty, we must yet consider the effect of an aider-abettor's guilty plea upon his principal.

██ To say that an aider and abettor cannot be found guilty unless the principal is found guilty is different from saying that one so charged may plead guilty without a like plea by the principal. In the latter case, the guilty plea does not carry with it a finding that the principal is first guilty. It is not a necessary conclusion, therefore, that a jury instructed as to the dependency of its verdict as between principal and aider-abettor would adjudge a principal guilty on the plea of an aider, particularly where there has yet been no evidence, where there are curative or cautionary instructions, and where there are final, comprehensive instructions regarding proof, testimony, and weighing of the evidence.

A number of courts have determined that a co-conspirator's or co-defendant's entry of a guilty plea, even on occasion before the jury, was not prejudicial, in view of a cautionary instruction. E. g., Koolish v. United States, 8 Cir., 340 F.2d 513 (1965), cert. den., 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965); Casados v. United States, 5 Cir., 300 F.2d 845 (1962), cert. den., 373 U.S. 938, 83 S.Ct. 1543, 10 L.Ed.2d 693 (1963); Davenport v. United States, 9 Cir., 260 F.2d 591 (1958), cert. den., 359 U.S. 909, 79 S.Ct. 585, 3 L.Ed.2d 573 (1959); Nemec v. United States, 9 Cir., 178 F.2d 656 (1949), cert. den., 339 U.S. 985, 70 S.Ct. 1006, 94 L.Ed. 1388 (1950).

██ Whatever the rule should be regarding a confession of a co-conspirator, cf. Orfield, Criminal Procedure Under the Federal Rules, § 14.94, we are not persuaded that a jury cannot follow an admonition as to a plea of guilty where no evidence is elicited and where the meaning of the plea for other defendants

is not emphasized. Absent aggravating circumstances, such as an incurable direct, stated, or necessary implication of the guilt of other defendants by the pleader, or the failure of the trial judge to give the jury cautionary instructions, we hold that the acceptance of a guilty plea by an aider-abettor without declaration of a mistrial is not error. Without a convincing demonstration otherwise, it is to be presumed that clear and strong cautionary instructions are curative.

### Severance

Defendants Sachs and Curran contend that the trial court committed prejudicial error in failing to grant them a severance from Kahn. Their contention is threefold. They claim that by being tried with Kahn, they were deprived of the right to comment in their argument to the jury upon Kahn's failure to take the stand. In the same manner, they contend they were precluded from exercising their Sixth Amendment right to call Kahn to the witness stand. Finally, they argue that the failure to sever resulted in the introduction of substantial complex testimony and documentary evidence that would have been inadmissible against them in a separate trial.

For his part, Kahn contends that there was an improper joinder of defendants, arguing in effect that because of the conspiracy count, he was subjected to the evils attendant upon conspiracy trials— the admission of evidence and proof of conspiracy by evidence admissible only upon the assumption that conspiracy existed. In other words, Kahn's argument appears to be the same as-the final contention of Sachs and Curran that had there been separate trials, certain evidence that was admitted in the joint trial could not have been admitted against Kahn.

■ Severance of offenses and defendants is discretionary with the trial court. Rule 14, Federal Rules of Criminal Procedure, 18 U.S.C.A.; Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); United States v. Echeles, 7 Cir., 352 F.2d 892 (1965), and cases cited there. Of course, such discretion is subject to correction if abused. *Echeles*, supra.

■ Generally, where the indictment charges a conspiracy, or a crime having a principal and aider-abettors, the rule is that persons jointly indicted should be tried together. United States v. Lebron, 2 Cir., 222 F.2d 531, 535 (1955), cert. den., 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955). And where proof of the charges against the defendants is dependent upon the same evidence and alleged acts, as is the case when the charged relationship of the defendants is principal-aider-abettor, severance should not be granted except for the most cogent reasons. United States v. Smith, D.C. Ill., 209 F.Supp. 907, 914 (1962). Cf. United States v. Kahaner, D.C.N.Y. 203 F.Supp. 78 (1962); United States v. Bentvena, D.C.N.Y., 193 F.Supp. 485 (1960), aff'd, 2 Cir., 357 F.2d 58 (1966), cert. den., 385 U.S. 815, 87 S.Ct. 35, 17 L.Ed.2d 54 (1966). Not to be forgotten among the considerations affecting the exercise of the trial court's discretion is the possible prejudice to the Government which might result from a separate trial. *Smith*, supra.

We are aware of and concerned with the problems in protecting the rights of individuals in conspiracy trials. Procedural and evidentiary advantages given the prosecution and the substantial difficulties raised for defendants attempting to distinguish themselves and their acts as innocent in a confusing crowd of suspicious figures and activities were noted by Justice Jackson in his classic concurring opinion in Krulewitch v. United States, 336 U.S. 440, 445, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

■ Acts and declarations of conspirators in furtherance of a conspiracy are admissible against alleged co-conspirators. Ordinarily, some evidence of a conspiracy should be furnished before the statements of alleged co-conspirators are admitted against each other. This practice, however, is relaxed by the discretion of the trial court. Statements

and testimony as to acts are received in evidence, with an objection shown, and the jury is given the mass of evidence, undifferentiated except as the order of proof, objections of counsel, and instructions of the judge distinguish it. The jury is instructed, as it was a number of times in this case, both during the trial and at the charge, that if it finds beyond a reasonable doubt that a conspiracy existed, then the acts and statements of those whom it finds conspirators are admissible against the co-conspirators. But the jury is also instructed that in determining whether any particular defendant was a member of the conspiracy, it should consider only his own acts and statements, as a defendant cannot be bound by the acts or statements of members of the conspiracy until the jury finds that a conspiracy existed and that he was a member of it.

It can be readily seen, therefore, that a conspiracy trial creates real and serious possibilities of confusion in the jury, which may indulge in unwarranted imputations of guilt, particularly where the evidence is complex or circumstantial and where there are many defendants.

These are the risks of a conspiracy trial before a jury, risks tempered by the assumption of the jury system that jurors understand and follow instructions on the law. As always, however, the theoretical issue must be examined in the glare of fact. The question which must be asked in the particular case is whether the possibilities of danger to a fair trial have become realities of prejudice in the jury.

▮ Thus, with respect to a severance in a trial of co-conspirators or co-defendants, it is necessary to determine whether a joint trial infringes a defendant's right to a fundamentally fair trial. *Echeles,* supra. This determination is made by asking whether it is within the jury's capacity, given the complexity of the case, to follow admonitory instructions and to keep separate, collate and appraise the evidence relevant only to each

defendant. Gorin v. United States, 1 Cir., 313 F.2d 641, 646 (1963), cert. den., 374 U.S. 829 (1963); *Smith,* supra; *Kahaner,* supra.

▮ In view of the complete admonitory instructions given by the trial court, to find an abuse of discretion in the trial court's failure to grant a severance of defendants in a trial on an indictment charging conspiracy and joining defendants in the relation of principal-aider-abettor, on grounds relating to the complexity and admissibility of evidence, the defendants must make a strong showing of prejudice. We have examined the cited record for the suggested confusing and prejudicial knot of evidence and have not found it. Not having found nor having been shown the clear likelihood of confusion in the jurors' minds so great as to prejudice the defendants, we hold the trial court did not abuse its discretion in refusing to grant a severance.

Sachs and Curran, relying on De Luna v. United States, 5 Cir., 308 F.2d 140, 1 A.L.R.3d 969 (1962), reh. den., 324 F.2d 375 (1963), claim prejudice from their joint trial with Kahn because of their inability to comment on Kahn's failure to take the stand.

*De Luna* was a narcotics case in which the two co-defendants had contradictory defenses. De Luna and Gomez were the occupants of a car from which police observed narcotics thrown. Gomez testified that he was innocent and that his only connection with the narcotics occurred when de Luna, seeing police coming, tossed him a package, the contents of which were unknown to Gomez, and told him to throw it out the window, which he did. De Luna did not testify, and his attorney argued that Gomez was the sole culprit. Gomez was found not guilty; de Luna guilty. On the question of whether the Fifth Amendment protected de Luna from prejudicial comments on his silence, the court held that he had a constitutionally guaranteed right to silence and that his co-defendant's attorney could not comment on his silence.

In the course of its opinion, the court offered the following dicta, upon which defendants rely:

> "If an attorney's duty to his client should require him to draw the jury's attention to the possible inference of guilt from a co-defendant's silence, the trial judge's duty is to order that the defendants be tried separately.
>
> \* \* \* \* \* \*
>
> " \* \* \*. And considering the case from Gomez's point of view, his attorneys should be free to draw all rational inferences from the failure of a co-defendant to testify, just as an attorney is free to comment on the effect of any interested party's failure to produce material evidence in his possession or to call witnesses who have knowledge of pertinent facts. Gomez has rights as well as de Luna, and they should be no less than if he were prosecuted singly. His right to confrontation allows him to invoke every inference from de Luna's absence from the stand." *De Luna* at 141, 143.

Circuit Judge Bell, in his special concurrence in *De Luna,* expressed his disagreement with the majority with respect to the scope of the right of Gomez:

> "There is no authority whatever for the proposition that Gomez would in any wise have been deprived of a fair trial if the comments regarding the failure of de Luna to testify had not been made. He had no right to go that far. He did have the right to testify against de Luna as he did. \* \* \*
>
> \* \* \* \* \* \*
>
> " \* \* \*. If Gomez, or others similarly situated, claims the right which the majority holds that he has to comment on the failure of de Luna to testify, a mistrial will be required at the instance of his co-defendant who did not take the stand. In addition, severance in advance of trial may be required where there is a representation to the court that one co-defendant does not expect to take the stand while another or others do expect to testify, and claim their right to comment upon the failure of the other to testify. This would eliminate joint trials, or vest in a defendant the right to a mistrial during final arguments, or in the alternative create built-in reversible error, all in the discretion of the defendants." *De Luna* at 155–156.

The remarks of Judge Bell clearly reveal the difficulties involved in holding that defendants have a right to comment upon the silence of their co-defendants. The question as we see it is how essential is it to a fair and complete defense, an attribute of a fair trial, that defendants be permitted to comment upon a co-defendant's exercise of his right against self-incrimination.

The procedural difficulties and the complication of joint trials arising from the rule suggested by dicta in *De Luna* are so great that we cannot say there is an absolute right, without reference to the circumstances of defense at trial, for a defendant to comment on the refusal of a co-defendant to testify. We think there must be more to justify the disintegration of a trial, such as a conspiracy trial, in which there is a cohesion of crime alleged, defendants charged, and proof adduced. There must be a showing that real prejudice will result from the defendant's inability to comment. Hayes v. United States, 8 Cir., 329 F.2d 209, 221 (1964); cert. den., 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748 (1964).

There was an effort in the defense to get the jury to divorce its consideration of the guilt of Sachs and Curran from that of Kahn on the various charges, and correlative to this, there was an attempt to portray Sachs and Curran as innocent and rather naive agents of a dexterous mastermind, Kahn, and his principal accomplices. An element of Kahn's defense, somewhat inconsistent with that of Sachs and Curran, was that Kahn, in his activities, acted, apparently in good faith, with the advice and in conjunction with responsible and reputable individuals.

Thus, it must be concluded from the record that the defense of Sachs and Cur-

ran was inconsistent with that of Kahn. The degree of antagonism, however, is not as great as that in *De Luna* where the defenses were mutually exclusive. There, if one defense were believed, the other could not be. In the instant case, it is not clear that Kahn could not have been found innocent if Sachs and Curran were so found.

It must be noted that there were many witnesses and that a great amount of evidence was brought before the jury. However, the extensive evidence and testimony did not present the jury the dilemma of mutually exclusive defenses, with no evidentiary basis for judgment between them, in which a comment on the failure to testify would indicate which horn of the dilemma should be seized. While we dislike the necessity of weighing the benefit which might accrue to a defendant by his counsel's comment on a co-defendant's refusal to testify, we are not convinced that Sachs and Curran suffered any prejudice from their inability to do so. We hold that the trial court did not err in refusing to sever for the ground asserted.

Finally, with respect to severance, Sachs and Curran, relying on United States v. Echeles, supra, claim that the joint trial with Kahn prejudiced them by precluding them from exercising their right to call Kahn to the witness stand.

In *Echeles,* attorney Echeles was tried jointly with his former client, Arrington, for subornation of perjury. Echeles moved for severance, which was denied, on the ground, *inter alia,* that he would be unable to call Arrington to the stand for the purpose of eliciting testimony exculpatory of Echeles. On appeal, this court, aware of the fact that there was record testimony of Arrington from prior proceedings which was exculpatory of Echeles stated:

 " * * * we hold merely that, having knowledge of Arrington's record testimony protesting Echeles' innocence, and considering the obvious importance of such testimony to Echeles, it was error to deny the motion for a separate trial." *Echeles* at 898 of 352 F.2d.

As with the right to comment on the silence of a codefendant, there is no absolute requirement for a severance when defendants suggest that the testimony of a co-defendant is not available to them unless they are tried separately. The unsupported possibility that such testimony might be forthcoming does not make the denial of a motion for severance erroneous. United States v. Kahn, 2 Cir., 366 F.2d 259, 263–264 (1966), cert. den., 385 U.S. 948, 87 S.Ct. 324, 17 L.Ed.2d 226 (1966); Olmstead v. United States, 9 Cir., 19 F.2d 842, 847–848 (1927), aff'd, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).

*Kahn's Further Contentions.*

In addition to those of the above contentions which he joins, Kahn urges that there was an improper joinder of defendants, that the court erred in not giving a certain instruction relating to Kahn's theory of defense, and that irrelevant and immaterial evidence was admitted.

Kahn contends that there was an improper joinder of the conspiracy count and the substantive counts of the indictment, claiming that the joinder reflects a prosecutorial attempt to overwhelm the defendants with prejudicial evidence in a situation in which the trial court cannot adequately protect them.

The question of a severance of counts, as Kahn recognizes, is addressed to the discretion of the trial court, the exercise of which is corrigible only for abuse. To find an abuse of discretion it would be necessary, in effect, to find that the facts and law presented to the trial judge at the time of the motion for severance demonstrated that a trial under joinder was likely to be unfair and that the trial was in fact unfair. Of course, the latter finding would go far in supporting the former.

The conspiracy count in the indictment in the present case essentially charges a conspiracy to commit the crimes charged in the substantive counts. Thus, there is no disparity of charges

tending to complicate or confuse the proof or defendants. In a trial under this kind of indictment, the possible threats to a fair trial arise from the joinder of defendants, and not of counts. The joinder of defendants, as we have held, was not improper.

■ With respect to the trial court's refusal to instruct the jury to acquit Kahn if it believed he was acting according to the advice of his counsel, the law requires, before an instruction relating to a theory of defense is given, that the record contain evidentiary support for the theory. Perkins v. United States, 9 Cir., 315 F.2d 120, 124 (1963), cert. den., 375 U.S. 916, 84 S.Ct. 201, 11 L.Ed.2d 155 (1963). That evidentiary support is lacking in this case. Furthermore, there must be a showing that the defendant made full disclosure to his attorneys of all the facts pertaining to the transactions under scrutiny. United States v. Hickey, 7 Cir., 360 F.2d 127, 142 (1966), cert. den., 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966). There is no contention on appeal that Kahn could not put on such proof because his attorneys were his co-defendants.

Kahn's final contention is that the trial court admitted immaterial and irrelevant evidence relating to transactions falling outside the indictment. The Government rejoins, however, that the evidence was both material and relevant.

■ We have examined the cited evidence, which relates to the repayment by certain companies controlled by Kahn of loans made them by a bank with which Kahn and Sachs were involved. Since the evidence relates to the disposition of loan funds, which defendants were charged with misapplying, we do not find it irrelevant to the inquiry into misapplication. Furthermore, we agree with the Government that these loans are imprinted with the pattern of loan manipulation with which Kahn was charged, and that evidence relating to them was relevant to intent with respect to the counts charged. See United States v. Klein, 2 Cir., 340 F.2d 547 (1965), cert. den., 382 U.S. 850, 86 S.Ct. 97, 15 L.Ed.2d 89 (1965).

■ Generally, the admission of evidence for such a purpose would require an instruction limiting the jury to consideration of it only with respect to intent. However, the evidence was not admitted with so limited a purpose, and no request was made that it be limited. Consequently, it must be deemed generally admitted, and as it was relevant and material, that its admission was not prejudicial.

In sum, we conclude that defendants were accorded a fair trial, and, there being no challenge to the sufficiency of the evidence to convict, the judgments appealed from are affirmed.

Affirmed.

## APPENDIX.

### COUNT I

1. That commencing on or about July 1, 1962 and continuing to on or about the date of this indictment, in the Northern District of Illinois and other places to the Grand Jurors unknown,

S. Lawrence Kahn,
Arthur B. Sachs,
Thomas E. Joyce, and
M. Prial Curran,

defendants herein, knowingly and wilfully did conspire, combine and confederate with each other and with Edward Ferrari and Mary Jean Burleson, named as co-conspirators herein, but not as defendants, and with other persons whose names to this Grand Jury are unknown, to commit offenses and to aid, abet, counsel and procure the commission of offenses against the United States, to-wit: to unlawfully and wilfully violate Sections 656, 657, 1001, 1005 and 1006, Title 18, United States Code, more particularly:

(a) to misapply and cause to be misapplied for their own personal gain, use, benefit and advantage moneys and funds of the Chatham Bank of Chicago, the deposits of which were insured by the Federal Deposit Insurance Corporation

with intent to defraud said Chatham Bank of Chicago;

(b) to misapply and cause to be misapplied for their own personal gain, use, benefit and advantage moneys and funds belonging to and entrusted to the care and custody of Leyden Savings and Loan Association, Franklin Park, Illinois; Equitable Savings and Loan Association, Chicago, Illinois; Property Federal Savings and Loan Association, Chicago, Illinois; and George Washington Savings and Loan Association, Chicago, Illinois, the accounts of which were insured by the Federal Savings and Loan Insurance Corporation, with intent to defraud said Savings and Loan Associations;

(c) to participate, share in and directly and indirectly receive moneys and funds of Leyden Savings and Loan Association, Equitable Savings and Loan Association, Property Federal Savings and Loan Association and George Washington Savings and Loan Association, through loans and transactions of said Associations, the accounts of which were insured by the Federal Savings and Loan Insurance Corporation, with intent to defraud said Associations;

(d) to make and cause to be made false entries in the books, reports, records and statements of Chatham Bank of Chicago, with intent to defraud said Chatham Bank of Chicago and the agents and examiners appointed to examine the affairs of said bank.

(e) to make and cause to be made false entries in the books, reports, records and statements of Leyden Savings and Loan Association, Equitable Savings and Loan Association, Property Federal Savings and Loan Association and George Washington Savings and Loan Association, with intent to defraud said Associations and the auditors, agents and examiners of the Federal Home Loan Bank Board.

2. It was a part of said conspiracy for the defendants through their control of the management and operation of the Chatham Bank of Chicago to fraudu-lently cause loans to be made by said Chatham Bank of Chicago in excessive amounts to various individuals and corporations controlled by said defendants or their nominees for defendants' own personal use, benefit and advantage.

3. It was a further part of said conspiracy for the defendants through their control of the management and operation of Property Federal Savings and Loan Association to fraudulently cause loans to be made in excessive amounts to various individuals and corporations controlled by said defendants or their nominees for the defendants' own personal use, benefit and advantage.

4. It was a further part.of said conspiracy for the defendants to acquire control of the management and operation of Leyden Savings and Loan Association with funds partially supplied through loans defendants fraudulently caused to be made by Chatham Bank of Chicago.

5. It was a further part of said conspiracy for the defendants to secure control of the management and operation of Leyden Savings and Loan Association partially with funds derived from a loan commitment letter defendants fraudulently caused to be issued on behalf of Property Federal Savings and Loan Association.

6. It was a further part of said conspiracy for the defendants upon acquiring control of the management and operation of Leyden Savings and Loan Association to cause loans in excessive amounts to be fraudulently granted by Leyden Savings and Loan Association to various corporations controlled by the defendants or their nominees for the defendants' own personal benefit, use and advantage.

7. It was a further part of said conspiracy for the defendants to use moneys and funds obtained through loan proceeds defendants caused to be fraudulently disbursed by Leyden Savings and Loan Association to purchase control of Equitable Savings and Loan Association and George Washington Savings and Loan Association.

8. It was a further part of said conspiracy for the defendants upon acquiring control of Equitable Savings and Loan Association to cause excessive loans to be granted to various corporations controlled by the defendants or their nominees for the defendants' own personal benefit, use and advantage.

9. It was a further part of said conspiracy for the defendants to cause fraudulent loans to be made by Property Federal Savings and Loan Association and Equitable Savings and Loan Association for the purpose of securing funds necessary to repay various outstanding loans defendants had fraudulently caused to be granted for their own personal use, benefit and advantage at Chatham Bank of Chicago and Leyden Savings and Loan Association.

10. It was a further part of said conspiracy for the defendants to conceal their control of the management and operation of Leyden Savings and Loan Association, Equitable Savings and Loan Association and George Washington Savings and Loan Association through the use of nominees whom defendants caused to be appointed officers and directors of said Associations.

11. It was a further part of said conspiracy for the defendants to fraudulently cause inflated real estate appraisal reports to be submitted to Chatham Bank of Chicago, Leyden Savings and Loan Association, Property Federal Savings and Loan Association and Equitable Savings and Loan Association to support mortgage loans defendants caused to be granted by these institutions for the defendants' own personal use, benefit and advantage, well knowing that said appraisals were not based on fair market values but were in truth and in fact based upon speculation and conjecture as to the future potential of the properties involved.

12. It was a further part of said conspiracy for the defendant through false statements and representations to Federal Home Loan Board examiners and Illinois State examiners investigating the affairs of Chatham Bank of Chicago, Equitable Savings and Loan Association and Leyden Savings and Loan Association and Property Federal Savings and Loan Association to attempt to conceal information with respect to various loans defendants had fraudulently caused to be made by these institutions as well as the disbursement and disposition of proceeds thereof.

13. Defendants and co-conspirators at several times and places hereinafter mentioned performed and caused to be performed overt acts in pursuance of, in execution of and to effect, employ and accomplish the objects, designs and purposes of said conspiracy, including, but not limited to, the following:

## OVERT ACTS

1. On or about October 1, 1962 Edward Ferrari caused an application for a loan to be made in the name of Raymond Kuznair, in the amount of $75,000.00 at Property Federal Savings and Loan Association, Chicago, Illinois.

2. On or about October 30, 1962 defendant Arthur B. Sachs caused Articles of Incorporation of Sandy Building Corporation to be filed at the office of the Secretary of State, Springfield, Illinois;

3. On or about November 1, 1962 at Chicago, Illinois, S. Lawrence Kahn presided at a meeting of the Executive Committee of the Chatham Bank of Chicago.

4. On or about November 1, 1962 at Chicago, Illinois, S. Lawrence Kahn and Arthur B. Sachs executed an escrow agreement with the Scott-Grand Building Corporation.

5. On or about November 2, 1962 Thomas E. Joyce executed a letter of commitment as attorney for Property Federal Savings and Loan Association addressed to Chatham Bank of Chicago.

6. On or about November 2, 1962 Arthur B. Sachs caused Chatham Bank of Chicago Cashier's Check No. 301214 in the amount of

$155,000.00 payable to Edward Ferrari, to be deposited in the account of Arthur B. Sachs at the American National Bank and Trust Company of Chicago.

7. On or about November 8, 1962 M. Prial Curran, Henrietta Keating, Jerome Kritchevsky and Victor Born were appointed to the Board of Directors of Leyden Savings and Loan Association at a meeting of the Board of Directors of said Association held at Franklin Park, Illinois.

8. On or about November 15, 1962 Thomas E. Joyce had a conversation on the telephone with Victor Born.

9. On or about November 28, 1962 Arthur B. Sachs issued a check drawn on his account at the American National Bank of Chicago in the amount of $175,000.00, payable to Alan James Development Company;

10. On or about December 20, 1962 M. Prial Curran executed an escrow agreement as escrow agent for Chatham Bank of Chicago relating to the sale of permanent reserve shares of Equitable Savings and Loan Association.

11. On or about January 23, 1963 at Chicago, Illinois Edward Ferrari on behalf of ASKO Investments, Inc. executed a contract for the purchase of permanent reserve shares of George Washington Savings and Loan Association.

12. On or about January 23, 1963 Leyden Savings and Loan Association, Franklin Park, Illinois, defendant S. Lawrence Kahn caused the issuance of two Leyden Savings and Loan Association's checks, to-wit: Check No. 10755, in the amount of $616,900.00, payable to Premier Investment Service, Inc., and Check No. 10754, in the amount of $375,000.00, payable to Three States Mortgage Company.

13. On or about January 25, 1963 defendants caused a loan in the amount of $400,000.00 to be made by American National Bank and Trust Company, Chicago, Illinois, to Viking Investment Corp.

14. On or about February 19, 1963 at Chicago, Illinois Rudy Weinberg was elected Secretary-Treasurer and Arthur B. Sachs appointed General Counsel of Equitable Savings and Loan Association by the Board of Directors of Equitable Savings and Loan Association.

15. On or about March 28, 1963 Rudy Weinberg had a conversation with M. Prial Curran at Chicago, Illinois.

16. On or about April 8, 1963 Arthur B. Sachs deposited Check No. 77502 of Equitable Savings and Loan Association in the amount of $41,341.88 to his account at the American National Bank of Chicago.

17. On or about June 20, 1963 defendants S. Lawrence Kahn and Arthur B. Sachs caused to be submitted to Equitable Savings and Loan Association an appraisal report of Angelo LoMonaco and Associates.

18. On or about August 2, 1963 Arthur B. Sachs wrote a letter to Federal Home Loan Bank Board, 104 South Michigan Avenue, Chicago, Illinois.

in violation of Section 371, Title 18, United States Code.

## COUNT III.

The January 1964 Grand Jury further charges:

That on or about November 2, 1962, in the Northern District of Illinois, Eastern Division,

### S. LAWRENCE KAHN,

Vice President and member of the Board of Directors of Chatham Bank of Chicago, and

ARTHUR B. SACHS,

duly appointed attorney of the said Chatham Bank of Chicago, the deposits of which were then insured by the Federal Deposit Insurance Corporation, with intent to defraud the said Chatham Bank of Chicago, did unlawfully and wilfully misapply and cause to be misapplied moneys, funds and credits of said Chatham Bank of Chicago in the amount of $225,000.00 by fraudulently causing to be disbursed Chatham Bank of Chicago Cashier's Check No. 301222, dated November 2, 1962, in the amount of $225,000.00, payable to Midwest Bank and Trust Company, which sum purportedly represented proceeds of a loan made to Sandy Building Corporation secured by a mortgage on the property located at 10001 West Grand Avenue, Franklin Park, Illinois, well knowing that said property failed to provide sufficient security for the loan in that said property had a fair market value substantially less than the disbursement of $225,000.00 as aforesaid; in violation of Section 656, Title, 18, United States Code; and

M. PRIAL CURRAN,

did wilfully and knowingly and with intent to defraud the Chatham Bank of Chicago as above described, aid, abet, counsel, induce and procure the commission of the above and foregoing offense against the United States of America; in violation of Sections 2 and 656, Title 18, United States Code.

COUNT IV.

The January 1964 Grand Jury further charges:

That on or about November 2, 1962, in the Northern District of Illinois, Eastern Division,

S. LAWRENCE KAHN,

defendant herein, Vice President and member of the Board of Directors of Chatham Bank of Chicago, and

ARTHUR B. SACHS,

defendant herein, duly appointed counsel of the said Chatham Bank of Chicago, the deposits of which were then insured by the Federal Deposit Insurance Corporation, with intent to defraud said Chatham Bank of Chicago, did unlawfully and wilfully misapply and cause to be misapplied moneys, funds and credits of said Chatham Bank of Chicago in the amount of $155,000.00 by fraudulently causing to be disbursed Chatham Bank of Chicago Cashier's Check No. 301214, dated November 2, 1962, in the amount of $155,000.00, payable to Edward Ferrari, purportedly representing proceeds of a Chatham Bank of Chicago loan in the amount of $155,000.00 which defendants S. Lawrence Kahn and Arthur B. Sachs fraudulently caused to be granted to Edward Ferrari, well knowing that the proceeds of said loan would be used for the personal benefit and advantage of said defendants and further well knowing that said loan was granted on the basis of a false and fraudulent letter of commitment executed by Thomas E. Joyce purportedly on behalf of Property Federal Savings and Loan Association, dated October 31, 1962, which letter purportedly committed said Association to pay $155,000.00 to Edward Ferrari and Chatham Bank of Chicago from proceeds of four loans described therein, whereas in truth and in fact said defendants well knew Thomas E. Joyce executed said letter of commitment without authority and without said commitment having been approved by the Board of Directors of said Property Federal Savings and Loan Association and further, without all four loans referred to in said letter of commitment having been approved by said Property Federal Savings and Loan Association at the time of the issuance of said commitment as aforesaid; in violation of Section 656, Title 18, United States Code; and

THOMAS E. JOYCE,

did, wilfully and knowingly and with intent to defraud the Chatham Bank of Chicago as above described, aid, abet, counsel, induce and procure the commission of the above and foregoing offense against the United States of America; in violation of Sections 2 and 656, Title 18, United States Code.

## COUNT VII.

The January 1964 Grand Jury further charges:

That on or about January 17, 1963, in the Northern District of Illinois, Eastern Division,

### S. LAWRENCE KAHN,

defendant herein, Vice President and member of the Board of Directors of the Chatham Bank of Chicago, and

### ARTHUR B. SACHS,

defendant herein, duly appointed counsel of said Chatham Bank of Chicago, the deposits of which were then insured by the Federal Deposit Insurance Corporation, with intent to defraud said Chatham Bank of Chicago, did unlawfully and wilfully misapply and cause to be misapplied moneys, funds and credits of said Chatham Bank of Chicago in the amount of $123,125.00 by fraudulently causing to be deposited in the account of Premier Investment Service, Inc., $123,125.00 representing proceeds of Chatham Bank of Chicago Loan No. 29400, which loan defendants caused to be granted by said bank on the basis of a letter of commitment dated January 15, 1963 from Leyden Savings and Loan Association to Premier Investment Service, Inc. committing said Leyden Savings and Loan Association to make a loan in the amount of $616,900.00 to Premier Investment Service, Inc., which commitment the defendants well knew to be false and fraudulent in that Premier Investment Service, Inc. possessed no legal interest in the property purportedly to be used as security for making said loan and further well knowing that said letter of commitment had been obtained without the approval or knowledge of the Board of Directors of said Leyden Savings and Loan Association; in violation of Section 656, Title 18, United States Code.

### COUNT VIII. [Dismissed as to Kahn.]

The January 1964 Grand Jury further charges:

That on or about January 23, 1963, in the Northern District of Illinois, Eastern Division,

### S. LAWRENCE KAHN,

connected with Leyden Savings and Loan Association, Franklin Park, Illinois, by means of and through his nominee, Victor Born, Executive Vice President of said Association, and through whom said defendant S. Lawrence Kahn exercised control over the operations of said Association, and

### ARTHUR B. SACHS,

attorney for said Association, a Savings and Loan Association, the accounts for which were then insured by the Federal Savings and Loan Insurance Corporation, with intent to defraud said Leyden Savings and Loan Association, did unlawfully and wilfully misapply and cause to be misapplied moneys, funds and credits belonging to and entrusted to the care and custody of said Leyden Savings and Loan Association in the amount of $616,-900.00, by fraudulently causing to be disbursed Leyden Savings and Loan Association Check No. 10755, dated January 24, 1963, payable to the order of Premier Investment Service, Inc., which sum of $616,900.00 purportedly represented proceeds of a loan defendants fraudulently caused to be made without the knowledge and approval of the Board of Directors of said Leyden Savings and Loan Association well knowing that said Association received no legally enforceable interest in any property as security for making said disbursement; in violation of Section 657, Title 18, United States Code.

### COUNT X. [Dismissed as to Kahn.]

The January 1964 Grand Jury further charges:

That on or about January 23, 1963, in the Northern District of Illinois, Eastern Division,

### S. LAWRENCE KAHN,

connected with Leyden Savings and Loan Association, Franklin Park, Illinois, by means of and through his nominee, Victor Born, Executive Vice President of said Association, and through whom said defendant S. Lawrence Kahn exercised control over the operations of said Association, and

ARTHUR B. SACHS,

attorney for said Association, a Savings and Loan Association, the accounts of which were then insured by the Federal Savings and Loan Insurance Corporation, with intent to defraud said Leyden Savings and Loan Association, did unlawfully and wilfully misapply and cause to be misapplied moneys, funds and credits belonging to and entrusted to the care and custody of said Leyden Savings and Loan Association in the amount of $375,000.00, by fraudulently causing to be disbursed Leyden Savings and Loan Association Check No. 10754, dated January 24, 1963, in the amount of $375,-000.00, payable to Three States Mortgage Company, which sum of $375,000.00 purportedly represented proceeds of a loan defendants fraudulently caused to be made without the knowledge and approval of the Board of Directors of said Leyden Savings and Loan Association, well knowing that said Association received no legally enforceable interest in any property as security for making said disbursement; in violation of Section 657, Title 18, United States Code.

## COUNT XVI.

The January 1964 Grand Jury further charges:

That on or about April 9, 1963, in the Northern District of Illinois, Eastern Division,

ARTHUR B. SACHS,

defendant herein, attorney for Equitable Savings and Loan Association, and

M. PRIAL CURRAN,

defendant herein, a member of the Board of Directors of said Equitable Savings and Loan Association, the accounts of which were then insured by the Federal Savings and Loan Insurance Corporation, with intent to defraud the said Equitable Savings and Loan Association, did misapply and cause to be misapplied moneys, funds and credits belonging to and entrusted to the care and custody of said Equitable Savings and Loan Association, in the amount of $625,070.27, on deposit at the South Shore National Bank transmitted via a wire transfer to the account of Three States Mortgage Company at the First Merchants National Bank, Michigan City, Indiana, which funds purportedly represented partial proceeds from Loan No. 12336 defendants fraudulently caused to be made by Equitable Savings and Loan Association in the amount of $800,000.00 without the knowledge and approval of the Board of Directors of said Equitable Savings and Loan Association, and well knowing that the property purportedly mortgaged to Equitable Savings and Loan Association as security for said loan had a fair market value substantially less than the amount of the loan, and that the appraisal report defendants caused to be submitted to Equitable Savings and Loan Association to support the disbursements as above described was false and fraudulent in that it was on a hypothetical plan regarding the future potential development of the mortgaged property and not on the property's then present character, to-wit: unimproved farm acreage; in violation of Section 657, Title 18, United States Code; and

S. LAWRENCE KAHN,

defendant herein, did, wilfully and knowingly and with intent to defraud the Equitable Savings and Loan Association as above described, aid, abet, counsel, induce and procure the commission of the above and foregoing offense against the United States of America; in violation of Sections 2 and 657, Title 18, United States Code.