UNITED STATES of America,
Plaintiff–Appellee,

v.

Humberto MARTIN, Defendant–
Appellant.

No. 90–3293.

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 1991.

Decided May 21, 1992.

Jeffrey E. Stone, Asst. U.S. Atty., Crim. Div., Barry R. Elden, Richard K. Kornfeld, argued, Asst. U.S. Attys., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Richard R. Mottweiler, argued, Chicago, Ill., for defendant-appellant.

Before COFFEY, RIPPLE and MANION, Circuit Judges.

COFFEY, Circuit Judge.

The defendant-appellant, Humberto Martin, in his appeal of his conspiracy to distribute cocaine alleges that the district court improperly informed the jury of his co-defendants' entries of pleas of guilty and that the trial court improperly compelled him to attend trial in identifiable prison clothing. We affirm.

## I. FACTS AND PROCEEDINGS BELOW

On June 11, 1990, a grand jury returned a two-count indictment charging the defendant (Humberto Martin) with conspiracy to distribute cocaine and with possession with intent to distribute cocaine in violation of Title 21 U.S.C. §§ 846 and 841(a)(1), and Title 18 U.S.C. § 2. Dionicio Lopez, Agerico Otero and Lillian Miranda also were charged in the indictment with conspiracy to distribute cocaine. Miranda pled guilty later that month to one count of conspiracy with intent to distribute cocaine and one count of possession with intent to distribute cocaine. Defendants Martin, Lopez and Otero were scheduled for trial on August 1, 1990.

On the morning of trial, Martin, Lopez and Otero were seated together at the table with defendant's counsel. After the prospective jurors had been brought into the courtroom and while the *voir dire* examination was being conducted, counsel for the defendant Martin approached the bench and had the following sidebar exchange with the court:

"COUNSEL FOR MARTIN: Are you aware that the other two defendants are planning on pleading guilty?

THE COURT: Well, that's up to them when we have a break. But right now we are selecting a jury.

COUNSEL FOR MARTIN: I agree. And I want of record that I object to them being present during trial when it's apparent that they are going to—

THE COURT: They haven't seen fit to bring this up before me in a proper way. There is nothing before me at the present time.

COUNSEL FOR MARTIN: There are plenty of things that I can't have control over, but I do object."

Following this conversation the court completed the *voir dire*, sent the jury out of the courtroom, and accepted Lopez and Otero's pleas of guilty in the absence of the jury. When the jury returned to the courtroom, the judge informed the jury *only* that the case against Lopez and Otero had been *"resolved."*

Evidence at trial revealed that the defendant Martin was involved in a conspiracy to distribute cocaine. Jeffrey Stickney, a special agent with the Drug Enforcement Administration, testified that agents of the DEA began an investigation in March of 1990 involving the sale of cocaine. During that month, undercover DEA Agent, Frank Guerra, purchased approximately two ounces of cocaine from Lopez and Otero on two separate occasions. Agent Guerra testified that on May 8, 1990, he met with Lopez and the defendant Martin at a liquor store at Peterson and Lincoln Avenues in Chicago, Illinois to arrange for the delivery of two kilos of cocaine, and during the meeting the government agent wore a hidden tape recorder. The tape recording of Agent Guerra's conversation with the defendant Martin and Lopez was admitted in evidence demonstrating the defendant Martin's involvement in the conspiracy:

"DEFENDANT MARTIN: I am going to set aside one for you. He's going to set aside one for you, but it has to be for sure because this man ... who's coming over here, he wanted all five ... but I am going to set aside yours. I am going to give him three and a half ... and one and a half.

AGENT GUERRA: Okay.

DEFENDANT MARTIN: You can count on this. I'm not going to leave you hanging."

The following day, May 9, 1990, DEA agents observed the defendant Martin and Lopez drive to Miranda's residence at 6049 North Albany in Chicago. A short time later the agents observed Martin leave the apartment, and enter a nearby Ford Probe, remove a white plastic bag and brief case,

and return to the apartment. Shortly thereafter, Lopez left the apartment and drove the vehicle back to the same liquor store where he previously had been observed in the company of Agent Guerra. Lopez met two DEA agents and accompanied them to join Otero in another car. At this time the agents arrested Lopez and Otero.

Following the arrest of Lopez and Otero, the DEA agents arrested Miranda and the defendant Martin in Miranda's apartment. After receiving consent from Miranda to search her apartment, the agents discovered the plastic bag and brief case that Martin had carried with him into the apartment from the car.[1] The bag contained approximately $87,000 in cash while the brief case held $86,935 in cash. The agents also recovered four ounces of cocaine in the bedroom.

The defendant Martin attended both days of his two-day jury trial in a blue jumpsuit given to nonbailed defendants awaiting trial and confined in the Chicago Metropolitan Correctional Center ("MCC"). After the first one-half day of trial and the *voir dire* examination and the jury selection had been completed, defense counsel objected to Martin's wearing his MCC-issued jumpsuit during trial, stating that he requested the marshal's office to give Martin civilian clothes to wear at trial, and that the marshals told him that they needed a minute order from the court to permit any defendant to change into civilian clothes. The court responded that according to a memorandum issued by the Chief Judge of the Northern District of Illinois, any request for different clothing should be made to the warden of the Metropolitan Correctional Center. According to the defendant, officials at the MCC subsequently refused a request to allow Martin to put on civilian

clothes without an order from the trial judge.[2]

Following the two-day trial, the jury found Martin guilty of both counts charged in the indictment, and he was sentenced to 137 months imprisonment followed by eight years of supervised release, together with a special assessment of $100.

## II.  ISSUES FOR REVIEW

The defendant Martin presents two issues for review: (1) whether the district court erred in refusing to grant his motion for mistrial after the court informed the jury that the case had been "resolved" with respect to the other defendants, and (2) whether the district judge committed reversible error when it refused to order the prison warden of the MCC to provide Martin with clothing other than the blue jumpsuit during the trial.

## III.  DISCUSSION

### A.  Mistrial Motion

■ The defendant-appellant Martin contends that the trial court committed error when failing to grant his motion for mistrial after the court informed the jury that the case had been *"resolved"* with respect to the other defendants. "The district court's decision to deny ... [a] motion for mistrial is reviewed under the abuse of discretion standard." *United States v. Perez*, 870 F.2d 1222, 1227 (7th Cir.1989) (citing *United States v. Fulk*, 816 F.2d 1202, 1205 (7th Cir.1987)).

In his brief, the defendant Martin erroneously states that "the trial court improperly informed the jury that co-defendant's [sic] Otero and Lopez had pled guilty." However, the district court never stated that co-defendants Otero and Lopez had

---

**1.**  As previously noted Miranda pled guilty before trial. At trial, she testified as a government witness against Martin.

**2.**  We note that prison officials are responsible for the security of the inmates who are transferred to and from the courthouse and are aware that the inmates in transit pose a risk of escape. To this end, prison officials in the exercise of reasonable authority, issue the inmates clothing.

Inmates of certain institutions are sometimes issued clothing with lettering or other types of identification which designates them as prisoners, but in this case the defendant Martin was issued a plain/unmarked jumpsuit that was devoid of any kind of identification. Upon a timely request to the presiding trial court judge, inmates are entitled to make arrangements to wear civilian clothing during trial.

pled guilty but merely stated that the cases against Otero and Lopez had been *"resolved"*:

> "As I described the case to you this morning, there were four persons charged in the indictment in this case. And I told [you] this morning that matters had been resolved with respect to Lillian Miranda. *The case has also been resolved with respect to Dionicio Lopez and Agerico Otero.* And so you're not to consider that fact in any way in deciding as to the remaining defendant, Humberto Martin. You are only to consider the evidence as to Mr. Martin in this case."

(Emphasis added). The word "resolve" is defined in Webster's College Dictionary (Random House, 1991) as "to come to a definite or earnest decision about...." The district court's use of "resolve" hardly implies that Otero and Lopez pled guilty, and for the defendant and/or his attorney to now claim that the district court informed the jury of the guilty pleas of Otero and Lopez is a blatant misrepresentation of the record. Furthermore, the record is most clear that the government never referred to the defendants, Lopez or Otero, as pleading guilty at any time during the trial. In fact, it was the defendant's trial counsel that made the guilty pleas of Lopez and Otero an issue when he told the jury during his closing argument in referencing to Lopez and Otero that "[t]he government got their drug dealers." By noting that the "government got their drug dealers," Martin's counsel attempted to convince the jury of Martin's relative innocence. Thus, for Martin to argue on appeal that he was prejudiced by the jurors' knowledge that Lopez and Otero pled guilty when it was Martin's own counsel who brought this information to the jury's attention in order to gain a tactical advantage is disingenuous at best.

■ Moreover, Martin's contention that the presence of Lopez and Otero during jury selection and their subsequent absence at trial was prejudicial to him because the jury inferred that Lopez and Otero had pled guilty is equally without merit. We have previously ruled that a co-defendant's entry of a guilty plea during trial is not in and of itself prejudicial to the remaining defendant(s). *See United States v. McGrath*, 811 F.2d 1022, 1024 (7th Cir. 1987); *United States v. Kahn*, 381 F.2d 824 (7th Cir.), *cert. denied*, 389 U.S. 1015, 88 S.Ct. 591, 592, 19 L.Ed.2d 661 (1967). The fact that jurors may have known that Martin's "codefendant[s] had pleaded guilty [is] not a ground for a mistrial, as we have held many times." *United States v. Gutman*, 725 F.2d 417, 422 (7th Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 183 (1984); *United States v. Aldridge*, 484 F.2d 655 (7th Cir.1973), *cert. denied*, 415 U.S. 922, 94 S.Ct. 1423, 39 L.Ed.2d 477 (1974). Martin has failed to demonstrate prejudice merely because of the absence of Lopez and Otero from the courtroom during trial, and there is no indication in the record that the jury's finding of guilty against Martin was influenced by the guilty pleas of Lopez and Otero. Indeed, Martin has failed to specifically cite how he was prejudiced by any juror's alleged knowledge that Lopez and Otero pled guilty. Martin's claim that the jury inferred from the absence of Lopez and Otero that the two pled guilty is without merit because the jury could just as easily have believed that the charges against the two had been dismissed or that their cases were joined with another case for trial, or for that matter had been transferred to another judge for trial or adjourned. Were we to agree with Martin's claim of prejudice, which we do not, it would make it virtually impossible for a defendant in a multiple-defendant case to change his plea and enter a plea of guilty once the trial has commenced.

■ After informing the jury that the case had been resolved, the district court gave the following cautionary instruction: "And so you're not to consider that fact in any way in deciding as to the remaining defendant, Humberto Martin. You are only to consider the evidence as to Mr. Martin in this case." "[W]ithout a convincing demonstration otherwise, it is to be presumed that clear and strong cautionary instructions are curative." *United States v. Aldridge*, 484 F.2d at 659 (quoting *Unit-*

ed States v. Kahn, 381 F.2d at 838). In addition, at the end of the trial, the court further instructed the jury that Martin was presumed innocent of the charges and that the guilty plea of the government's witness, Lillian Miranda, was not to be considered as evidence against Martin:

"The defendant is presumed to be innocent of the charges. This presumption remains with the defendant throughout every stage of the trial and during your deliberations on the verdict. And it is not overcome unless from all of the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty.

"The witness, Lillian Miranda, has pleaded guilty to crimes arising out of the same occurrences for which the defendant is now on trial. You may give the witness' testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care. Moreover, the guilty plea of Lillian Miranda is not to be considered as evidence against the defendant."

Moreover, we note that Martin's trial counsel never proposed a specific instruction to explain the absence of Lopez and Otero following jury selection. Because Martin has failed to demonstrate prejudice much less argue that the jury disregarded the cautionary instruction or the final jury instruction, we hold that the trial judge did not abuse her discretion or commit trial error in accepting the co-defendants' pleas of guilty in the manner she did during the course of the trial in the jury's absence, and furthermore, the court's denial of Martin's motion for mistrial was proper.[3]

### B. Prison Jumpsuit

■ The defendant Martin contends that because the district court refused to issue

---

**3.** Martin claims in his brief that the presence of Lopez and Otero at jury selection was "clearly avoidable" because the court knew in advance of jury selection that Lopez and Otero intended to plead guilty. However, the following exchange between the trial judge and defense counsel reveals that the trial judge did not know that Otero and Lopez planned to plead guilty until after the trial had begun:

"MR. MOTTWEILER [Counsel for defendant Martin]: It was related to you, I know the record was made at the time that the pleas were taken between Mr. Otero and Mr. Lopez that they had planned to plead guilty before we began proceedings this morning.

THE COURT: I don't know what their plans were, motions apparently were filed by one of them. I don't recall which—that were not even noticed up, but were filed within the last two days. So I don't know when—when that decision was made.

As you know, I ask that pleas not be made on the morning of trial for the very reason that the time that we spent this morning could have been—well, we are underutilizing the jury's—

MR. MOTTWEILER: I am the one that is being prejudiced, not them. I understand that.

THE COURT: Well, you are not being prejudiced. *But I didn't know, and as you can well appreciate,* the—I assume the U.S. Attorney's Office didn't know since there was no written plea agreement with respect to either defendant.

MR. MOTTWEILER: Everyone—I don't know what you knew specifically since you were in the back and you came out after the jury came out, but I know that your secretary was informed that both defendants intended to plead guilty prior to any proceedings this morning. I was in the back hallway when she was told that. The U.S. Attorney was told that before any proceedings began today. Yet all three sat there during jury selection.

I believe based upon that and the fact that they did plead guilty after the jury selection and your Honor came out and informed the jury that their cases had been resolved, indicating only one thing, that they had pled guilty, I believe that that has prejudiced my client, and I would ask for motion for a mistrial based upon that.

THE COURT: That motion is denied. As you know, this happens frequently in a case, and in fact I assume the evidence is going to relate to all four defendants in this case. And I won't be surprised if it doesn't come out that at least one if not more has pled guilty in this case.

And if you want a limiting instruction either at the time that testimony comes in or with the final instructions, I will certainly give that kind of an instruction if you propose one.

MR. MOTTWEILER: My question—my motion is really towards how it was handled, and that was that they were permitted to be there during jury selection, immediately thereafter they were not there.

THE COURT: They were still defendants in the case, Mr. Mottweiler.

MR. MOTTWEILER: But—

THE COURT: *And I certainly didn't know whether indeed they would plead guilty, whether indeed I would accept their pleas, or anything else until they did plead guilty.*

(Emphasis added).

an order allowing him to wear civilian clothes during trial, he was in effect prejudiced by being compelled to wear an MCC-issued jumpsuit. Even though the defendant Martin admits in his brief that "this jumpsuit may not, by itself, be identifiable as prison garb," the fact that Lopez and Otero were present during *voir dire* wearing jumpsuits that were identical to Martin's enabled the jury to conclude that the jumpsuits were prison garb. Thus, Martin argues that the district court committed reversible error.

It is well settled that a "state cannot, consistent with the accused's right to a fair trial as secured by the Fourteenth Amendment, compel a defendant to stand trial before a jury in identifiable prison attire." *Tarpley v. Dugger,* 841 F.2d 359, 361 (11th Cir.1988) (citing *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)). However, the Supreme Court in *Estelle* noted that the accused must *timely* object to being tried in prison garb and that "the failure to make an objection to the court as to being tried in such [identifiable prison] clothes, *for whatever reason,* is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." *Estelle,* 425 U.S. at 512–13, 96 S.Ct. at 1697 (emphasis added). The Supreme Court in *Estelle* reversed the Fifth Circuit's determination that the defendant had been compelled to attend trial in identifiable prison garb. The Fifth Circuit noted that the general practice at the time of the defendant's trial was that non-bailed defendants in the trial court's jurisdiction were tried in jail clothes. In reversing the Fifth Circuit, the Court stated that "[n]otwithstanding the evidence as to the general practice ... there was no finding that nonbailed defendants were compelled to stand trial in prison garments *if timely objection was made to the trial judge."* *Estelle, id.* at 510, 96 S.Ct. at 1696 (emphasis added). The Court concluded:

"Nothing in this record, therefore, warrants a conclusion that [the defendant]

was compelled to stand trial in jail garb *or that there was sufficient reason to excuse the failure to raise the issue before trial."*

*Id.* at 512, 96 S.Ct. at 1697 (footnote omitted) (emphasis added).

The defendant Martin failed to object to wearing a plain/unmarked jumpsuit until after the first one-half day of trial and the completion of the *voir dire.* The district court responded to this objection by stating that according to a memorandum issued by the Chief Judge of the District Court for the Northern District of Illinois, Eastern Division, a request by a defendant for a suit of clothes should be made to the warden of the Chicago Metropolitan Correctional Center. According to Martin's counsel, officials at the MCC refused to allow Martin to don a suit of clothes absent an order from the district court.[4] However, as the district court noted, if Martin did not want to wear government-issued clothing during his court appearance, he or his counsel should have *timely* raised the issue on the record before the start of trial to give the court authorities and the U.S. Marshal time to make the necessary arrangements.

Like the defendant in *Estelle,* the defendant in the case before us failed to make a timely objection. Any prejudice that may have occurred from the jury observing Martin in plain/unmarked government-issued clothing could have been prevented by the defense counsel making a timely objection to the court on the record before any trial proceedings had commenced and not waiting until the middle of the first day of trial after the entire jury selection process and the empaneling of the jury had been completed to arrange for other clothing. Obviously, even if the district court had allowed Martin to change clothes mid-trial, the defendant's counsel's failure to make a proper and *timely* objection on the record before any trial proceedings, would have given the jury the opportunity to observe Martin in MCC-issued

---

4. The record is unclear regarding the actual policy in effect at the time of Martin's trial dealing with defendants who wished to wear civilian clothes in the courtroom, and neither the government nor the defendant cite any specific written policy, order or memoranda in their respective briefs.

clothing. Furthermore, counsel for the defendant Martin also failed to request a curative instruction from the court to reduce any alleged prejudice Martin's clothing might have had on the jury. We note also that the defendant is unable to demonstrate that the plain/unmarked jumpsuit that he wore during the two days of trial was clearly identifiable as prison clothing.[5] Unlike the defendant in *Estelle* whose clothes were readily identifiable and distinctively marked as prison-issue, the defendant Martin in this case wore a plain single-color jumpsuit devoid of any letters, markings, or numbers that would designate it as prison garb. As Martin notes in his brief, "this jumpsuit may not, by itself, be identifiable as prison garb." However, Martin contends that because he, Lopez and Otero wore identical jumpsuits in front of the jury, "[t]here can be no doubt in the jury's mind that this was prison clothing." Unlike the defendant, we are unconvinced that the jury made the inference that three co-defendants who were wearing plain single-color jumpsuits necessarily established that the clothing was prison garb. Furthermore, since the record does not support an inference that the average juror realizes that prisoners wear jumpsuits, we may not assume that the jury perceived the jumpsuits as prison uniforms in view of the district court's specific finding that Martin's clothes were not obvious prison garb. This finding of fact is subject to the "clearly erroneous standard." *See Anderson v. City of Bessemer City*, 470 U.S. 564, 572, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). "This standard plainly does not entitle the reviewing court to reverse the finding of the trier of facts simply because it is convinced that it would have decided the case differently." *Id.* at 573, 105 S.Ct. at 1511. Thus, we will not upset the district court's finding of fact that Martin's clothes were not obvious prison garb.

Martin's presence before the jurors in a plain/unmarked jumpsuit was by no means as potentially prejudicial as prisoners being shackled or bound, and we note these practices have been allowed by the Supreme Court:

> "Notwithstanding the importance of [the general rule against the use of physical restraints in the courtroom] to insuring a fair trial, a defendant's right to appear and to have his witnesses appear without restraints is not absolute. In *Illinois v. Allen*, 397 U.S. [337,] 344, 90 S.Ct. [1057,] 1061 [25 L.Ed.2d 353] [ (1970) ], the Supreme Court stated that binding ... a defendant is permissible when necessary to control contumacious conduct at trial."

*Harrell v. Israel*, 672 F.2d 632, 635 (7th Cir.1982) (citations omitted). Like the defendant in the case before us, the petitioner in *Harrell* did not object in a timely fashion to the complained of procedure:

> "It is also significant that petitioner raised no objection to the trial judge's shackling order when it was first issued. In an analogous context, a defendant's failure to object to being tried in prison garb was found by the Supreme Court to negate his claim that he was compelled to stand trial in such attire against his will. *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691 [48 L.Ed.2d 126] (1976). The Court reasoned in *Estelle* that because a defendant may elect to wear prison clothing in an attempt to elicit sympathy from the jury, a due process claim based on that fact could not be sustained on appeal in the absence of a showing that the defendant had been forced to appear in prison clothing over his specific objection. Although we do not rely solely upon the rationale of *Estelle* for our conclusion here, *we find the fact that petitioner did not object supportive of our conclusion that the trial judge did not abuse his discretion.*"

*Id.* at 637 (emphasis added). As a result of Martin's failure to make a timely objection,

---

5. The court specifically stated:
  "They were not in obvious prison garb. And they were seated at a table. They—the marshal is very considerate and sensitive to the fact that defendants who are in custody should not be brought in and out of the courtroom in cuffs or trotted out in front of the presence of the jury in their prison uniforms. The defendants are always seated in the courtroom when the jury comes in."

the district court did not err in refusing to allow him to change into civilian clothes part way through the trial where the defendant had failed to make a proper, timely objection.

■ We refuse to hold that the wearing of an unmarked government-issued jumpsuit could rise to the level of a constitutional error. But even if we were to find that the district court erred in refusing to grant the defendant's untimely request for civilian clothing and thus prejudiced his rights, this error would be harmless given the overwhelming evidence of the defendant's guilt in the cocaine conspiracy. The Supreme Court recently stated:

> "Since this Court's landmark decision in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless error analysis to a wide range of errors and has recognized that *most constitutional errors can be harmless.* . . . In applying harmless-error analysis . . . the Court has been faithful to the belief that the harmless-error doctrine is essential to preserve the 'principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focussing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error."

*Arizona v. Fulminante*, —— U.S. ——, ——–——, 111 S.Ct. 1246, 1263–64, 113 L.Ed.2d 302 (1991) (citations omitted) (emphasis added). This circuit has recently addressed the harmless error doctrine of *Chapman:*

> "We recognize that 'there can be no such thing as an error free, perfect trial, and that the Constitution does not guarantee such a trial. . . . Since *Chapman*, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, *including most constitutional violations.*' *United States v. Hasting*, 461 U.S. 499,

508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983) (emphasis added) (citations omitted). While [the petitioner's] trial was not perfect, and we might add, very few are, any error was harmless in view of the overpowering evidence of his guilt."

*Hunter v. Clark*, 934 F.2d 856, 860 (7th Cir.1991).

The overwhelming evidence of Martin's guilt in this cocaine conspiracy and the applicable case law mandate that we hold that any error that occurred as a result of the district court's failure to grant the defendant's untimely request for civilian clothing is harmless. Undercover DEA agent, Frank Guerra, testified at trial regarding a meeting with Lopez and the defendant Martin that occurred on May 8, 1990, in which the three discussed arrangements for the delivery of two kilograms of cocaine. The tape recording of Agent Guerra's discussion with the defendant Martin and Lopez was admitted in evidence and demonstrated that Martin negotiated for the delivery of two kilograms of cocaine:

> "MARTIN: I am going to set aside one for you. He's going to set aside one for you . . . but it has to be for sure because this man . . . who's coming over here[,] he wanted all five . . . but I am going to set aside yours . . . I am going to give him three and a half . . . and one and a half. . . .
>
> GUERRA: Okay. . . .
>
> MARTIN: You can count on this. I'm not going to leave you hanging."

In addition, Martin also provided Agent Guerra with his beeper number and arranged a time to meet Agent Guerra the following day in order to complete the transaction:

> "GUERRA: I . . . I'll call you when I already have the money.
>
> MARTIN: (UNINTELLIGIBLE) telephone (VOICES OVERLAP) . . . no.
>
> GUERRA: On my hand.
>
> MARTIN: 420–87 you call me.
>
> GUERRA: Yours? Yours I have it . . . yes . . . 420–87. . . .

MARTIN: Tomorrow you call me. What (UNINTELLIGIBLE) you put down for me? I don't remember anymore.

GUERRA: Zero ... a double zero.

\* \* \* \* \* \*

GUERRA: Once ... once I have the money in my hand, I'll call you tomorrow.

MARTIN: That's fine.

GUERRA: Figure about ...

MARTIN: At about 3:00.

GUERRA: Between 2:00 and 4:00 to be sure.

MARTIN: Let's do it as soon as possible to see if tomorrow I ... these people leave ... that's already on it's way....

MARTIN: Something big is on its way."

Moreover, the following day, May 9, 1990, DEA agents observed Martin leave Miranda's apartment and retrieve a white plastic bag and briefcase from a car parked nearby, and return to the apartment. During their consensual search of Miranda's apartment later that day, DEA agents discovered the plastic bag and briefcase that Martin had carried with him into the apartment from the car. Each held approximately $87,000.00 in cash.

Thus, the above-cited evidence, combined with the other evidence received at trial, including but not limited to Martin's pivotal role in conducting negotiations for the cocaine delivery and his being entrusted with over $170,000.00 of the conspiracy's cash, clearly points to his active participation in the conspiracy to distribute cocaine. We are convinced that even if the district court had committed error when it refused to grant Martin's counsel's untimely request to obtain civilian clothing for his client, such error would have been harmless.

## IV. CONCLUSION

The decision of the district court is AFFIRMED.

RIPPLE, Circuit Judge, concurring.

I join the judgment of the court on the ground that requiring the defendant to stand trial in prison garb was, on this record, harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

Requiring a defendant to appear before a jury in prison garb is a serious breach of standard criminal trial procedure. Here, the jurors saw three individuals, all attired in the same color jumpsuit, seated with defense counsel. As the district court noted, a jumpsuit is "hardly the striped prison uniform of yesteryear." Tr. at 382. Yet, a jury sufficiently intelligent to comprehend the government's case against the defendant was also able to understand the significance of this attire. I therefore find it disturbing that the majority seems to limit the Supreme Court's holding in *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), to situations where the prisoner designation on the clothing is more graphic. I certainly hope that prison authorities and trial courts within this circuit view this intimation with prudence and caution. *Estelle* is still the law of the land. It recognizes that trial in prison garb is a "constant reminder of the accused's condition implicit in such distinctive, identifiable attire." *Estelle*, 425 U.S. at 504–05, 96 S.Ct. at 1693–94. Trial courts are obliged under its mandate to ensure that the defendant's prison clothing is not "a continuing influence throughout the trial." *Id.* at 505, 96 S.Ct. at 1693. In implementing this rule, "reason, principle, and common human experience," *id.* at 504, 96 S.Ct. at 1693, are to be the guide.

My brothers also rely on the doctrine of waiver to support their position. Waiver is an important—indeed vital—principle in the fair and orderly conduct of all litigation, including criminal litigation. While the cold record is always an unsatisfactory device for assessing the informal interchanges between court and counsel, my review of this record leaves me with a lingering doubt—indeed a substantial doubt—as to whether full responsibility for the situation before us should be placed at the feet of defense counsel. It seems that a more cooperative atmosphere between the court

and both counsel could have ensured that the guilty pleas of the co-defendants were accepted before the selection of the jury. (It appears that counsel for the co-defendants had at least informally made known their clients' plans, although intermediaries had apparently not informed the court. Tr. at 138.) It also seems that the matter of clothing could have been worked out somewhat more informally. In any event, once counsel raised the matter, the damage should have been minimized by permitting the change at the earliest possible opportunity.[1]

The record in this case does not reveal an excess of cooperative communication between court and counsel. When matters such as those under scrutiny here arise, all the professionals involved—court, government counsel, and defense counsel—have an obligation to resolve them (and have an interest in resolving them) courteously and expeditiously. These issues never should have reached this court, because they never should have arisen at trial.

---

**1.** Counsel's later reference to the prison garb can be viewed as a tactical choice (perhaps ill-advised) to minimize the damage of the court's earlier rulings.