UNITED STATES of America, Appellee,

v.

Bernard HENRY, also known as Ozzie Stealson, Defendant–Appellant.

No. 419, Docket 93–1876.

United States Court of Appeals, Second Circuit.

Argued Nov. 29, 1994.

Decided Jan. 26, 1995.

Leonard Lato, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty., E.D.N.Y. Peter A. Norling, Asst. U.S. Atty., of counsel) for appellee.

Lloyd Epstein, New York City (Epstein & Weil, of counsel) for defendant-appellant.

Before: LUMBARD and MINER, Circuit Judges, and SAND,* District Judge.

LUMBARD, Circuit Judge:

Bernard Henry appeals from a judgment of conviction entered on December 15, 1993, in the Eastern District of New York (Nicholas Tsoucalas, *Judge,* Court of International Trade, sitting by designation) following a jury trial. The jury convicted Henry of conspiring to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841 and 846; importing cocaine, in violation of 21 U.S.C. § 952; and conspiring to import cocaine, in violation of 21 U.S.C. § 963. The

---

* United States District Judge for the Southern District of New York, sitting by designation.

court imposed sentence of 235 months imprisonment, five years supervised release, and a $150 special assessment. Henry complains of prosecutorial misconduct, compulsory appearance before the jury in prison garb, and errors at trial and sentencing. We affirm.

## I.

At trial, the government offered the testimony of Anthony Lee, Sharon Holman, Joseph Hughes, Adele Jones, and Carol Beckles. Lee and Holman were arrested on February 16 and 19, 1992, respectively, as each attempted to bring roughly two kilograms of cocaine through customs at Kennedy Airport. The investigation of Lee and Holman led customs agents to arrest Beckles, Jones, and Hughes. All five witnesses pleaded guilty to related drug charges, and testified pursuant to cooperation agreements arising from these pleas. Based on their testimony, the government charged Henry in connection with two separate schemes to import cocaine from Antigua, one in November 1991 and the other in February 1992.

As to the November 1991 scheme, Lee testified that he met Henry in 1989 through Edward Hunt, a cocaine trafficker based in Antigua. In November 1991, Henry contacted Lee about smuggling cocaine from Antigua. On November 5, Lee flew from Chicago to Puerto Rico, where he met Henry; the two then flew to Antigua. In Antigua, Henry procured four kilograms of cocaine, which he dropped off at the house of a woman named "Cynthia." Upon their return to New York, Lee and Henry stayed at the Ramada Inn in New Rochelle. Later that month, Henry drove Lee and two couriers, Holman and Jones, to Kennedy Airport. Lee, Holman, and Jones flew to Antigua and obtained from Cynthia some prewrapped, sealed packages; Holman and Jones each strapped two such packages to their bodies, masking the odor of cocaine with perfume. Henry met the three at Kennedy Airport upon their return, and took them to the Ramada Inn in New Rochelle. Henry told the two women that he could not pay cash; Holman accepted part payment in cocaine. Thereafter, Lee and Henry flew to Florida to meet Hughes, who was supposed to sell Henry's cocaine.

Holman, Jones, and Hughes confirmed Lee's account of the November 1991 scheme. Jones and Holman both testified that in November 1991, Henry took them to the airport and provided them with American Airlines tickets to Antigua; that in Antigua, each received two wrapped, pre-sealed packages, which they strapped to their bodies, masking the odor of cocaine with perfume; and that Henry picked them up on their return, took possession of the packages that they had smuggled in from Antigua, and paid Holman in cocaine. Jones stated that Henry had recruited her to smuggle cocaine, while Holman stated that she was recruited by Jones on Henry's behalf. Hughes testified that Henry and Lee came to his home in Delray Beach, Florida in December 1991 with cocaine, which he converted to crack and distributed.

As to the February 1992 scheme, Lee testified that while in Florida, he arranged with Hunt to smuggle more cocaine at a later date. Lee mentioned this deal to Henry. Henry suggested that he and Lee send Holman to import the cocaine, and then avoid payment to Hunt after Holman's return by falsely telling Hunt that the cocaine never arrived due to Holman's arrest at customs. Lee then flew to Antigua in February 1992. When Lee arrived, however, he decided not to follow the plans he had made with Henry, and instead decided to deliver Hunt's cocaine to a third party. Holman then arrived, bearing a ticket in the name of Sharon Beckles. Lee told her that he no longer worked for Henry, but introduced her to Hunt, who intended to use her in a different smuggling operation. Lee then flew to New York and was arrested on February 16 as he tried to bring two kilograms of cocaine through customs.

Holman and Beckles confirmed this account. Beckles testified that Henry, who dealt her cocaine, induced her to supply Holman with a ticket to Antigua. Holman testified that Henry recruited her for another smuggling run in February 1992, supplying her with a ticket to Antigua issued in Beckles's name. When Holman arrived in Anti-

gua, Lee informed her that the deal with Henry was off, but introduced her to Hunt, who paid for Holman's return passage to the United States and arranged for her to smuggle two kilograms of cocaine to another party. She then flew to New York and was arrested on February 19 as she tried to bring two kilograms of cocaine through customs.

In addition to such testimony, Henry's American Express records confirmed the trip to Antigua in early November 1991 described by Lee. A hotel clerk testified that he assigned Henry a room in the New Rochelle Ramada Inn later that month. Henry's name appeared on a Ramada Inn receipt for Room 614, running from November 18 to December 13, 1991, and the room's telephone log showed a call to Cynthia's number on November 26. Airline tickets retrieved from Holman and Jones matched their accounts, and their address books contained Henry's beeper number and his Ramada Inn room and telephone number. Finally, a search of Henry's basement yielded a triple-beam balance scale, which Lee had seen Henry use in order to "cut" cocaine.

The defense emphasized that Lee and Holman, not Henry, were caught red-handed attempting to import cocaine from Antigua. At the time of arrest, Lee planned to deliver cocaine to Hughes and Tony Mathis, not Henry, while Holman's cocaine was intended for delivery to Denvil Martin and Dawn Joseph. Joseph Ferrigno, a customs agent who had conducted the investigation leading to Henry's arrest, conceded that neither Beckles, Holman, nor Lee initially mentioned Henry as a co-conspirator, and that when Holman and Lee were requested to make monitored calls to their co-conspirators, neither called Henry.

Henry himself offered a different version of the events in question, testifying that in November 1991, he loaned money to Lee to travel to Antigua, and went there himself to pursue his interests as a professional musician. Upon Lee's return, Henry obtained a discount for Lee by using his own Ramada Inn card to reserve a room. He drove Lee and two unknown women to Kennedy Airport and later, upon their return, to the Ramada Inn, unaware that the women were drug

couriers. Thereafter, he met with Lee again, seeking reimbursement of expenses charged to Henry's American Express account during their joint trip to Antigua. He then traveled to Florida, hoping that George Martin, a wealthy relation of Hughes, would finance a musical recording. During this time, he neither discussed drugs with Lee nor conspired with Holman to import cocaine from Antigua.

The jury convicted Henry on charges of importing, conspiring to import, and possessing cocaine, but acquitted him of possessing cocaine with intent to distribute.

## II.

Henry complains that two instances of prosecutorial misconduct substantially prejudiced his right to a fair trial. The first instance occurred when the prosecutor cross-examined Christopher Reese, a "jailhouse lawyer" acquainted with Henry. Reese testified that he once shared a cell with Lee, and that Lee admitted to Reese that he had fabricated testimony against Henry in order to obtain favorable treatment for himself. When cross-examining Reese, the prosecutor asked: "You are basically making statements that Anthony Lee pulled the wool over our eyes, the prosecutor's eyes?" Henry objected, but the court overruled him. The government concedes that the question was improper and that the objection should have been sustained.

The second instance occurred when the prosecutor asked the following questions of customs agent Ferrigno:

Q: Is it fair to say that any of the defendants ... that are cooperating in this case, that there was a period where they would talk to you first, is that correct?

A: Yes.

Q: You would then disseminate that information to the United States Attorney's Office, personally to me?

A: Yes.

Q: And then you and I would discuss the value of that person's testimony?

A: That's correct.

Q: And then we would make a decision to do what?

A: Whether we thought they were credible.

Q: To do what?

A: Offer them an agreement to cooperate with the government.

At trial, Henry raised no objection to these questions.

■ This court has disallowed prosecutorial cross-examination that compels a witness to state that a law enforcement officer is offering false testimony. *United States v. Richter*, 826 F.2d 206, 208–09 (2d Cir.1987). The prosecutor's cross-examination of Reese indirectly challenged Reese to dispute the prosecutor's own credibility. Because such cross-examination directed the jury "to trust the Government's judgment rather than its own view of the evidence," *United States v. Young*, 470 U.S. 1, 18–19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985), it should have been excluded. Yet because of its isolated nature, we doubt that this single improper question to Reese could have affected the jury's deliberation.

■ As to the prosecutor's cross-examination of Ferrigno, the government contends that it was permitted by *United States v. Pujana–Mena*, 949 F.2d 24, 32–33 (2d Cir. 1991). We disagree. In *Pujana–Mena*, the defense criticized a drug agent for failing to corroborate the account provided by a key informant; the government was allowed to inquire whether, at time of investigation, the drug agent had found the informant credible. Unlike the prosecutor in *Pujana–Mena*, the prosecutor here did not confine his questioning to Ferrigno's pre-trial views. Rather, he persistently referred to, and elicited testimony about, the beliefs he himself had formed during the investigation—beliefs not subject to cross-examination and not properly in evidence. Such expressions of the prosecutor's personal beliefs improperly bolstered the witnesses' credibility. *See, e.g., United States v. Modica*, 663 F.2d 1173, 1178–79 (2d Cir. 1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *United States v. Drummond*, 481 F.2d 62, 63–64 (2d Cir. 1973).

Yet we do not believe that this colloquy between the prosecutor and Ferrigno, to which Henry did not object at trial, was plain error under Fed.R.Evid. 103, *i.e.*, error that "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings," *Young*, 470 U.S. at 15, 105 S.Ct. at 1046 (citation omitted). Unlike the prosecutors in *Richter* and *Drummond*, the prosecutor here did not re-emphasize the content of the challenged colloquy, which involved only four questions, during summation. We therefore doubt that the colloquy could have had any significant effect on jury deliberation.

Five government witnesses—Lee, Holman, Jones, Hughes, and Beckles—confirmed in detail each other's account of Henry's role in these two schemes. Their accounts were corroborated by Ramada Inn and American Express records, airline tickets produced at trial, the address book entries of Jones, Holman, and Lee, and the testimony of a Ramada Inn clerk. In view of the strength of the government's case, and the jury's opportunity to assess the credibility of the witnesses during four days of trial, we believe that Henry has failed to show that he did not receive a fair trial.

### III.

Henry complains that he was cross-examined in a scurrilous, racially-prejudicial manner. He points to three incidents: (1) the government asked whether Henry had nicknamed his son "Bogeyman," and next asked, "[i]sn't it a fact that you told your wife in November of 1991, when Anthony Lee was there, not to allow Bogeyman to go down to the basement"; (2) Henry, who is black, also was asked whether he had traveled to Antigua with "two white females"; and (3) Henry was asked whether he had an out-of-wedlock child with a woman named Patricia Richards.

■ We do not believe that any errors committed by the government in its cross-examination of Henry were more than harmless error. The "Bogeyman" references occurred when Henry was questioned about the contents of his basement, which contained drug paraphernalia and which Henry kept locked; presumably, Lee, a cooperating witness who had visited Henry's home and seen his basement, provided the prosecutor with

the basis for this question. The references to "white females" occurred during questioning about an October 1991 trip to Antigua; Henry stated that he could not remember his companions, prompting the question, "[i]sn't it a fact that you made a trip down to Antigua in October of 1991 with two white females for the specific purpose of going down there to transport drugs back to New York?"

The government acknowledges that it was inappropriate for the prosecutor to ask Henry whether he had fathered Richards's child but urges that the error was harmless. The inquiry arose because the American Express charges linking Henry to the conspiracy were all made to Richards's account, which listed Henry as a secondary user. The nature of the relationship between Henry and Richards was therefore a relevant subject for inquiry to test Henry's credibility. Although the government correctly characterizes the questioning of Henry as to his out-of-wedlock child as "troublesome," we are satisfied that, in context, the questioning showed no appeal to racial prejudice and did not deprive Henry of a fair trial.

## IV.

■ Henry complains that after he was cross-examined by the government, he was denied a fair opportunity to rehabilitate his credibility when the court denied the defense counsel's request for redirect examination. We disagree.

The government conducted a vigorous cross-examination of Henry, bringing out that federal agents had obtained a triple-beam balance scale during a search of Henry's basement; that Jones and Holman possessed Henry's beeper number, even though he said they were strangers; and that Henry had made a telephone call from the New Rochelle Ramada Inn to Cynthia in Antigua on November 26, 1991. Henry's counsel then requested redirect examination, but did not state what purpose it would serve.

Under Federal Rule of Evidence 611(a), the court may "exercise reasonable control" over the examination of witnesses so as to promote proper fact-finding and avoid needless consumption of time. Although redirect

examination is available to explain new matters raised on cross-examination, see Joseph McLaughlin, 2 *Federal Evidence Practice Guide* ¶ 12.05 (1994), the attack on Henry's credibility was confined to matters already raised by Henry himself or previous witnesses. Because Henry failed to show any further basis for redirect examination, the court acted within its discretion under Rule 611 in denying the request.

## V.

■ Henry complains of being compelled to stand trial in prison clothing. Prior to trial, Henry was detained at the Metropolitan Correctional Center ("MCC"). Although defense counsel informed Henry's wife of the trial date on several occasions, she failed to provide Henry with civilian clothes on the first day of trial, allegedly because she gave the suit to MCC officers who misplaced it. Thus, Henry appeared in MCC-issued denim. The court denied Henry's request for adjournment because (1) defense counsel was responsible for ensuring that civilian clothes were brought to the courtroom, and (2) the MCC clothing was not clearly identifiable prison garb but merely unmarked, generic denim. On the second day of trial, Henry again appeared in MCC clothing, and was identified by Beckles as the man "wearing an MCC uniform." Later, Hughes explained that "MCC" stood for "Metropolitan Correctional Center." Henry contends that the court's ruling on the first day was error, and that he was further prejudiced by Beckles and Hughes's references to MCC clothing. We disagree.

A defendant may not be compelled to appear before the jury in clothing that is clearly identifiable as prison issue. See *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). We see no compulsion, as the court did not affirmatively prevent Henry from wearing civilian clothing, but simply refused to excuse Henry's failure to make proper arrangements despite receiving ample notice and opportunity. We likewise defer to the court's finding that a jury would not readily identify Henry's MCC denim as prison issue. See *United States v. Martin*, 964 F.2d 714, 720 (7th Cir.1992). Thus, the

court's ruling on the first day of trial was proper. As to the references by Beckles and Hughes to MCC clothing, any prejudice arising therefrom is due to Henry's failure to obtain different clothing on the second day.

## VI.

■ Finally, Henry appeals from his sentence. The court set Henry's base offense level at 32, attributing to Henry responsibility for six kilograms of cocaine—the four kilograms imported by Holman and Lee in November 1991, and the two kilograms imported by Holman in February 1992. After adjustments for Henry's use of a weapon, role in the offense, and obstruction of justice, his overall offense level was 38. On appeal, Henry seeks to reduce the base offense level to 30, and the overall level to 36, by arguing that the court wrongly found him responsible for the two kilograms seized from Holman in February 1992. We disagree.

Guidelines section 1B1.3(a)(1)(A) treats any acts that are "aided, abetted, counseled, commanded, induced, procured, or willfully caused by" Henry as relevant conduct in setting his base offense level. The court determined that (1) Henry sent Holman to Antigua in February 1992 in order to obtain cocaine from Hunt, and (2) Henry was not relieved of responsibility for the cocaine seized from Holman merely because Hunt had instructed her to deliver it to another party. We recently have stated that in gauging offense conduct, a defendant "should not be helped in sentencing by the fortuity that ... he could not, in fact, accomplish what he clearly intended." *United States v. Hendron,* 43 F.3d 24, 26 (2d Cir.1994). That principle aptly summarizes the court's sentencing determination here.

Affirmed.